In re the WHITE MOTOR CREDIT CORPORATION, White Motor Corporation, Gemini Mfg. Co., White Motor Corporation of Canada Limited, the White Motor Credit Corporation of Canada Limited, Debtors.

Bankruptcy No. B80–3360.

United States Bankruptcy Court, N. D. Ohio.

Aug. 13, 1981.

Michael J. Crames, P.C., Herbert S. Edelman, P.C., Levin & Weintraub, New York City, for debtors.

Eli Manos, Mansour, Gavin, Gerlack & Manos, Cleveland, Ohio, for Equity Securities Holder Committee.

Forrest B. Weinberg, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, for Creditors Committee of White Motor Corp.

## MEMORANDUM ORDER *RE* HEARING TO CONSIDER AGREEMENT WITH AB VOLVO

MARK SCHLACHET, Bankruptcy Judge.

This matter arises upon (a) the application of certain debtors (sometimes referred to as a "debtor") for a hearing to consider a sale of substantially all of the operating assets of White Motor Corporation ("White" or "White Motor") and Gemini Manufacturing Co. ("Gemini"), and (b) the application relating to such sale filed by the Official Creditors' Committee of Gemini. Although the scheduling of a hearing is ordinarily a routine matter, such action herein has most serious implications and has required hearing time, including substantial testimony and argument, on June 15, July 9 and July 21, 1981.

*FACTS*

The factual background of this matter may be stated as follows:

1. On September 4, 1980, White Motor and certain of its affiliates, including subsidiaries Gemini and White Motor Credit Corporation ("White Credit"), each filed with the Court a petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to an order of the Court the chapter 11 cases are being jointly administered for procedural purposes only.

2. At the time of the filing of the chapter 11 petitions, the principal and sole business of White Motor was the manufacture and distribution of (i) heavy trucks and related components and (ii) farm equipment and related implements. At the time of the filing of its chapter 11 petition, the principal and sole business of Gemini was the manufacture of certain components related to the trucks manufactured by White Motor and its affiliates. At the time of the filing of its chapter 11 petition, the principal and sole business of White Credit was the financing of wholesale and retail sales of the above-described trucks, farm equipment and related components manufactured by its affiliates.

3. Prior to the commencement of the chapter 11 cases, White Farm Equipment Company, a White subsidiary, had terminated manufacturing activities. By order dated December 10, 1980, as supplemented by order dated December 17, 1980, the Court authorized the sale of the capital stock of that debtor and certain related assets and properties to TIC Investment Corporation ("TIC").

4. By order dated March 14, 1981 the Court authorized the sale of the truck manufacturing operations of The White Motor Corporation of Canada Ltd., ("White Motor—Canada") to Nova and Bow Valley Industries, Ltd. Similarly, by order dated March 14, 1981 the Court authorized the sale of the farm manufacturing operations of White Motor-Canada to a joint venture company consisting of TIC and Linamar Machine, Ltd. In addition, by order dated April 22, 1981, the Court authorized the sale of White Motor's Australian subsidiary to Silchester Holdings Pty., Ltd.

5. On or about November 21, 1980, White Motor filed with the Court its schedules of assets and liabilities and statement of financial affairs as at the date it filed its chapter 11 petition. The schedule of assets reflects total assets of $597,866,577. The schedule of liabilities reflects obligations to general unsecured creditors in the aggregate amount of $525,836,570 and to secured creditors in the aggregated amount of $8,240,080 and liabilities to claimants entitled to priority under the Bankruptcy Code in the aggregate amount of $7,632,488.

6. Since the commencement of the chapter 11 cases, White Motor and Gemini have

continued to operate their respective businesses and manage their properties in accordance with Section 1108 of the Bankruptcy Code. The statement of operations filed by White Motor for the period ended December 31, 1980 indicates that it incurred losses of $8.3 million during the month of December of 1980. The statement of operations filed by White Motor for the period ended March 31, 1981 reflects that it incurred a net loss of $5 million during the month of March alone and a net loss of $10.7 million from January 1, 1981 through the end of March. It should be noted that the above described losses as reflected in White Motor's financial statements are actually understated since those statements have not been adjusted to exclude the earnings of White Credit during the relevant periods.

7. White's current market penetration is alleged to be 2% as compared with pre-petition levels in excess of 5%; significant accounts have lately turned to competitors to fill their needs for diesel trucks, including fleets thereof; the dealer network has indicated an erosion of confidence in White, while valued employees continue to leave the debtors' employ; losses for 1981 on a "stand-alone" basis are estimated to exceed $40 million with any return to profitability subject to both questionable assumptions and factors (e. g. lower interest rates and general market recovery) over which White has no control.

8. As indicated above, White Motor has incurred significant losses in excess of $33 million since the filing date and management forecasts that such losses will continue.

9. On June 9, 1981, White Motor, Gemini and White Motor International, Inc. entered into an agreement with AB Volvo for the sale of substantially all those debtors' truck manufacturing operations to a subsidiary of AB Volvo. The conditions precedent to the obligations of AB Volvo under this purchase agreement include (a) the entry of an order which unconditionally approves the agreement and the transaction contemplated by it and (b) consummation of the sale no later than August 31, 1981. Accordingly, unless the Volvo transaction is approved by the Court at a time which will permit the closing to take place by August 31, 1981, AB Volvo may withdraw its offer to purchase the truck manufacturing operations of White Motor and its affiliates.

10. As of the date hereof, it does not appear that any other purchaser has come forward with a serious offer to acquire the truck manufacturing operations of White Motor and the related entities.

11. The creditors of White and Gemini include vendors, trade suppliers, holders of public debt, both senior and junior, various lending institutions, employees, pensioners and others. These interests are divergent and indicate varying and opposing preferences as to the future course of debtors' activities.

12. At the hearing held on June 15, 1981, White Motor and Gemini informed the Court that they intended to apply for an order scheduling a hearing to consider the Volvo transaction. At that time, the Indenture Trustee for the subordinated debentureholders of White Motor objected to the proposed application until such time as the Court has determined whether it is appropriate to consider a sale of substantially all of a debtor's assets prior to the filing and/or confirmation of a plan of reorganization. The Court directed all interested parties to address those issues at a hearing scheduled for July 9, 1981.

13. Subsequently, the Official Creditors' Committee of Gemini filed an application with the Court for an order establishing the procedures upon which the Volvo sale might be considered, such procedure to include a determination of whether a plan or plans of reorganization for White Motor and Gemini or their affiliates must be filed or confirmed prior to or concurrent with approval of a sale of substantially all the assets of White Motor and Gemini. As noted above, if such a procedure is established, it is likely that the Volvo agreement will expire before the Court has an opportunity to consider whether such sale would be in the best interests of creditors of White Motor and affiliated debtors.

14. By order dated May 29, 1981, this Court appointed an Official Committee to represent the interests of equity security holders, which committee has since retained counsel and otherwise functioned as a full participant in these reorganization proceedings. By order dated August 8, 1981, the Court appointed an Official Creditors Committee to represent employees, present and former, which committee has since retained counsel and otherwise functioned as a full participant in these reorganization proceedings. The UAW was appointed to the Official Creditors' Committee of White Motor Corp. and has been active in these proceedings.

15. On April 8, 1981, upon request of Lazard Freres & Co., debtor's investment banker, the Court advised that a transaction with Volvo of the sort now contemplated should be proposed within the context of a plan of reorganization. A similar communication was provided debtor's counsel in May, 1981.

16. Volvo has at all relevant times been indifferent as to the format in which its contemplated asset purchases should be placed before the Court and interested parties.

17. Debtor has had ample opportunity to propose a plan of reorganization premised on the Volvo transaction. This is particularly true in light of 11 U.S.C. § 1129(a)(11), permitting confirmation of a reorganization plan notwithstanding the likelihood of further liquidation or reorganization. *See also* Section 1127, making liberal provision for plan modification.

18. The Volvo transaction involves a liquidation of all of the assets of Gemini and substantially all of the operating assets of the White Motor Corp.

19. The Official Creditors' Committee of Gemini, subordinated debt, equity security holders, and SEC oppose, absent a showing of emergency, consideration of the Volvo transaction in the absence of full compliance by the debtor with subchapter II of Chapter 11 of the Bankruptcy Code.

20. White Credit is a wholly owned subsidiary of White Motor and is a debtor in proceedings before this court. No plan of reorganization has been submitted in said proceeding.

21. Motor has sought and received on eight occasions extensions of the exclusive period within which the debtor alone may propose a plan of reorganization. The period of exclusivity has continued to the present. Thus, no other party has had an opportunity to submit a plan of reorganization herein. *See* 11 U.S.C. § 1121(d).

22. Motor has submitted an extensive "Business Plan", dated July 17, 1981. Such plan does not include specific provision for stand alone interest costs and does not specifically address the implications of Motor's persistent cash flow problems. It contains the bases for the information contained in paragraphs 7–8 above.

23. Conflicting data, particularly as to the anticipated market share, has been presented to the Court in other proceedings, to wit: on July 30, 1981, U.S.A. Marketing Manager Mr. Mark Obert stated that White expects to enjoy a 5%–6% market share for the fourth quarter, 1981 whereas the business plan suggests a 3.1% market share for the fourth quarter of 1981.

24. The business plan indicates a positive equity, aside from any equity existing by virtue of ownership in White Credit, of up to $100 million in 1987 should the company reorganize on a stand alone basis.

25. It is highly unlikely, under any set of foreseeable conditions or circumstances, that unsecured creditors of White Motor will receive full payment of their pre-petition claims in the near future. A Chapter 7 liquidation of Motor on August 31, 1981 would, absent subordination of major claims and interests, result in the payment of no money in respect of the interest of equity security holders.

*PROBLEM*

The contemplated sale constitutes a reorganization of White Motor, transforming the manufacturing debtors into what subordinated debt's representative has called a "pot of cash." Debtors seek to accomplish this reorganization under the administrative power of section 363 of the Bankruptcy

Code, which section simply permits a sale other than in the ordinary course of business after notice and opportunity for hearing.[1] Such a procedure side-steps the procedural and substantive provisions of Chapter 11 itself, including the disclosure statement (§ 1125), vote (§ 1126) and confirmation standards (§ 1129). There is no acknowledgement or recognition of the sale of all or substantially all of the property of a Chapter 11 debtor outside the provisions of Chapter 11 itself. *See, e. g.*, 11 U.S.C. §§ 1123(a)(5) and (b)(4), 1141(d)(3).

Whether a sale of such scope can be accomplished subject only to section 363 (or its predecessor under the Bankruptcy Act) has never been decided.[2] Similar fact patterns have forged a split of authority. *In re D. M. Christian Co.*, 7 B.R. 561, 7 B.C.D. 87 (Bkrtcy.N.D.W.Va.1980) (rejecting the procedure); *contra, In re WFDR, Inc.*, 10 B.R. 109 (Bkrtcy.N.D.Ga.1981); *In re Tele/Resources, Inc.*, 6 B.R. 628 (Bkrtcy.S. D.N.Y.1980). Indeed, under the Bankruptcy Act there existed an outright conflict among the circuits. *Compare In re Solar Mfg. Corp.*, 176 F.2d 493 (3rd Cir. 1949), *with In re Dania Corporation*, 400 F.2d 833 (5th Cir. 1968), *cert. denied* 393 U.S. 1118, 89 S.Ct. 994, 22 L.Ed.2d 122, *reh. denied*, 394 U.S. 994, 89 S.Ct. 1455, 22 L.Ed.2d 771 (1969). The more restrictive Act authority, *i. e., Solar*, would require an actual emergency, defined perhaps as virtual or near catastrophe. Such emergency would not be found in mere deadlines or eleventh hour pressure imposed by the parties. The liberal view embraced by the Fifth, Seventh and Ninth Circuits permitted such sales in the best interests of the estate merely to avoid erosion of the assets, although in most cases findings of fact indicated severe diminution should the sale not be approved.

## The Code's Mandate

In drafting and enacting the Bankruptcy Code, Congress deliberately rejected the suggestion that sales of the scope contemplated by the instant application might be accomplished under section 363(b). The Commission on the Bankruptcy Laws of the United States ("Commission"), charged with the responsibility to study, analyze, evaluate and recommend changes in the bankruptcy laws, submitted in its transmittal to Congress (July 30, 1973)[3] a proposed statute (entitled Bankruptcy Act of 1973) containing the precise provision which debtors and others need in order to sustain their position:

the plan must be proposed in good faith and any payments made or promised disclosed; insiders and others to occupy certain positions in the reorganized debtors post confirmation picture must be disclosed; acceptance by at least one class of claimants in requisite majorities of number and amount; mandatory disclosure of any likelihood or need for further reorganization or liquidation; fair and equitable, as well as non-discriminatory treatment as to all existing classes of claims or interests.

Of perhaps equal or greater importance are the provisions, within the plan or arrangement context, for disclosure of adequate information (11 U.S.C. § 1125) and the vote, *i. e.*, acceptance or rejection (11 U.S.C. § 1126). These provisions constitute "the heart" of the reorganization provisions of the new Code, and are beyond even the rule-making power of the Supreme Court. H.R.No. 95–595, 95th Cong., 1st Sess. (1977) 408, U.S.Code Cong. & Admin.News, 1978, 5787.

---

1. It is argued that section 363 is integral to chapter 11. While the statement may be true, it misses the point:

    Section 363 is a section of general application in cases under chapters 7, 11 and 13. There are a number of other sections in the Code of immediate importance in interpreting section 363 or to which reference must be made to understand its application. 2 Collier on Bankruptcy 363–12 (15th ed. 1980).

2. There is no statutory standard for court approval where a proposed sale is contested. Historically, courts have permitted sales by trustees if in the "best interests of the estate." *In re Tele/Resources, Inc.*, 6 B.R. 628 (Bkrtcy. S.D.N.Y.1980); *Supplemental Memorandum of Creditors' Committee and Certain Creditors of the White Motor Credit Corporation* (filed July 20, 1981) at 4. By contrast, while section 1129 contains a "best interest" provision in sub-section (a)(7) thereof, said requirement is but one of several confirmation standards which the Court, in an independent judicial exercise, must find satisfied if an order of confirmation is to issue. Specifically, the plan and proponent must comply with all *Chapter 11* provisions;

3. Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93–137, 93rd Cong., 1st Sess. (1973) 238. ("Comm.Rep.")

Sale or Lease of Property. If a lease or sale is not in the ordinary course of business pursuant to section 7–104, the administrator may authorize the sale of lease of property by the trustee or receiver, or by the debtor if there is no trustee or receiver, on such terms and conditions as the administrator may approve. *A sale or lease of all or substantially all of the property of the estate may be authorized by the court if in the best interests of the estate after notice hearing in accordance with Rules of Bankruptcy Procedure.* (emphasis added)

Comm.Rep., pt. II at 239, reprinted in 2 Collier on Bankruptcy (Appendix) (15th ed. 1980). (emphasis added) The explanatory note to the language makes unmistakably clear its relationship to the split of authority identified above, to wit:

> This section is derived from §§ 116(3), 313(2), and 413(2) of the present Act. Property may be sold or leased in the ordinary course of business without additional authorization by the administrator under § 7–104. However, any other sale or lease must be authorized by the administrator. If a debtor, trustee, or receiver believes that a sale or lease of all or substantially all of the property is desirable, such action must be authorized by the court on notice and hearing. There is a split of authority in the case law presently, with some courts allowing this type of sale, but others requiring some showing of emergency. This section makes it clear that a showing of emergency is not necessary.

Clearly, the Commission sought to eliminate the *Solar* requirement that, absent an emergency, virtual liquidations be accomplished only by way of a plan of reorganization.

The Commission bill was introduced in the House of Representatives on October 9, 1973 as H.R. 10792 by Congressman Donald Edwards, floor manager of the legislation during the entire eight years of its legislative sojourn. A second bill, containing in

section 4–717 the identical language of the last sentence of section 7–205 of the Commission bill, was advanced by the National Conference of Bankruptcy Judges. It was introduced on September 12, 1974 as H.R. 16643 (the "Judge's bill"). On the Senate side, S. 4026 was the counterpart to the Commission bill.

Matters remained at a standstill until the 94th Congress convened and subjected both proposals to intensive analysis. The Commission bill was reintroduced as H.R. 31 (S. 236) while the Judge's bill became H.R. 32 (S. 235). Hearings totalling 56 days were held during 1975–76 in the two Houses. The Justice Department addressed the legislation orally and in *The Department of Justice Detailed Comments on H.R. 32*[4] which commented specifically on Section 4–717 as follows:

> Sale or lease of 'all or substantially all of the property of the estate' goes beyond the language of the statutes presently applicable. Sale of so much of the estate's property amounts to a liquidation which should be handled under Chapter V [the liquidation, as opposed to reorganization, chapter] and not in the context of an arrangement or reorganization. Only in an unusual emergency should such an extensive sale or lease of property be authorized without formal transfer of the case to a liquidation proceeding.

It is difficult to imagine a scenario in which the overruling of *Solar* could be more at issue.

What finally emerged from the Judges bill, Commission bill, hearings and other legislative activity was H.R. 6, the forerunner of the Bankruptcy Code. Section 363(c) of H.R. 6, identical in relevant aspects to Section 363 of the Bankruptcy Code, granted the trustee or debtor-in-possession administrative power to use, sell or lease property of the estate in the ordinary course of business, without court authorization. This corresponded to sections 7–104 and 4–710 of the Commission and Judges' bills, respec-

4. Hearings on H.R. 31 & H.R. 32, Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 94th Cong., 1st & 2nd Sess., ser. 27, pt. 4 at 2123 (1975–1976).

590

tively. Section 363(b) granted to the trustee or debtor-in-possession authority, after notice and opportunity for hearing, to use, sell or lease property of the estate other than in the ordinance course of business. With procedural differences, e. g., "notice and hearing" rather that "on such terms and conditions as the court may approve", such authority corresponded to the first sentence of Sections 7–205 and 4–717 of the Commission and Judges' bills, respectively.

What did not survive the legislative process was the second sentence of sections 7–205 and 4–717 of the two earlier legislative proposals, which provisions had permitted, in the absence of any plan of reorganization, a "sale or lease of all or substantially all of the property of the estate ... if in the best interests...." The conscious deletion of the provision is not consistent with its promulgation.

As a matter of legislative intent, to endow section 363 with the purpose of or a potential for a total reorganization would nullify, at debtor's option, the major protections and standards of chapter 11 of the Code. For example, while section 1129 requires a confirmation hearing as to every liquidating (or other) reorganization plan, section 363 taken together with section 102 requires mere opportunity for hearing. In the instant case, therefore, the Volvo transaction could proceed without any hearing or court order whatever.[5] So manifestly unacceptable a possibility renders further investigation of statutory thrust unnecessary.

■ It is clear, and the Court holds accordingly, that in a chapter 11 reorganization under the Bankruptcy Code, Section 363(b) does not authorize sale of all or substantially all assets of the estate.

*The Emergency Exception*

There is an emergency, or at lest a crisis, in this case—but one of the debtor's own making. The situation is not one of imminent loss of all assets, but rather, a substantial likelihood of a comparative loss approaching $40 million, according to the debtor's Liquidation Analysis (July 17, 1981), should the sale not proceed. The crisis might have been avoided by firmer Court control and supervision of debtor's activities, or by empowering the examiner with additional functions pursuant to 11 U.S.C. § 1104(c). In any event, it would appear that Congress left the "emergency" exception in tact and its application is appropriate in this case. 11 U.S.C. § 105.

There are, moreover, other considerations which warrant exceptional treatment of the proposed sale to Volvo. First, White is and has been a first rate if not the leading truck manufacturer in its class VIII classification. Its engineering tradition is second to none. It has, however, suffered over a long period of time from a lack of strong management. While its current chief executive, Wallace Askins, cannot be praised too highly, one man may not be able to, in short order, reinstill the will to survive and accomplish the necessary infusion of dealer confidence.

White's chronic management problems indicate a significant likelihood—particularly under current market conditions over which it has no control—of a less advantageous liquidation should the Volvo agreement not gain approval. In other words, there exists no viable and acceptable alternative to Volvo at this time. No major constituency in this case can cite a strong probability of position enhancement should the Court not consider Volvo prior to August 31st. The potential and probable diminution of assets might well (to those with even a negotiating position) more than offset the anticipated benefits in a stand-alone scenario.

The lack of disclosure and vote cannot at this time be overcome. Nevertheless, it should be noted that the representation enjoyed by employees, pensioners, shareholders and other constituencies herein has been significant if not decisive. Committees have been appointed to represent all substantial interests. These committees have retained professionals, e. g. the equity security holders committee is receiving the

5. *In re Hanline*, 8 B.R. 449, 7 B.C.D. 256 (Bkrtcy.N.D.Ohio 1981); H.R.No. 95–595, 95 Cong., 1st Sess. (1977) 345; Sen.Rep. 95–989, 95th Cong., 2nd Sess. (1978) 55.

assistance of a financial consultant in an effort to identify and assess alternatives to Volvo. All court appointees have been encouraged to co-operate with various interested parties. The SEC and UAW have actively participated in most proceedings and the examiner has proved invaluable as a source of sunshine and enlightenment. Thus, the Volvo transaction has not emerged without the most thorough opportunities for analysis and assessment by all concerned.

Conditional notice of the Volvo proposal has been afforded all creditors, shareholders and other parties in interest. They may appear and be heard.

Thus, while counsel has erroneously disregarded the Court's candid remarks concerning the propriety of a plan format, there has in fact been no purposeful effort by the debtor's management to evade the disclosure requirements of the Code. Indeed, the impact of Volvo on the fate of White Credit (a major subsidiary with a potential dividend to White Motor of $100 million or more) is perhaps the principal justification for the failure to propose a plan in the Motor case. Moreover, based on the present record, the investment banker appears to have performed his tasks well and true; and the examiner has reported that good faith efforts to negotiate a Motor and White Credit plan have been diligently proposed by the debtors and most parties in interest.

## The Gemini Problem

The proposed sale of Gemini assets (*i. e.,* the sole source of and manufacturer of cabs for White trucks) presents its own unique problems. Here we have a distinct corporate entity whose assets are commandeered in order to make the Volvo transaction possible. Creditors of Gemini are not told how much Volvo is paying for the assets or what they are worth. Thus, our worst fears emanating from the absence of a reorganization plan are realized.

Specifically, Gemini's creditors are vendors and employees. The lending-institution overlap, which is characteristic of the Motor/Credit relationship, does not exist among Gemini creditors. Hence, a principal justification or reason for failure to file a liquidating plan does not exist. Gemini has other-than-Motor customers. Although Volvo is indifferent as to any allocation to Gemini from gross proceeds, Motor and its creditors have taken no steps to assuage the fears of Gemini creditors emanating from a perceived de facto consolidation of the two firms for purposes of the Volvo transaction.

■ Thus, a conflict has developed between the two debtors as evidenced by their opposing positions on the sale. While this aspect of the problem should not, in itself, disqualify the transaction, special procedures may be appropriate to assure a fair and expeditious disposition in the Gemini matter. Such procedures must originate with its creditors' committee.

## Jurisdiction

■ Volvo and White have agreed in paragraph 17.10 of their Agreement that the District Court for the Southern District of New York shall have jurisdiction of any disputes arising thereunder. Such a provision could well present practical problems in the administration of these complex reorganization cases. It is an affront to the jurisdiction of all federal courts and a derogation of the Congressional prerogative in establishing inferior courts. It is a nullity and, were it not, a district judge confronted with a substantial matter related hereto might, as Bankruptcy Judge Babbit did, transfer the matter to this Court.

## Procedure

Accordingly, the Court orders as follows:

1. A hearing to consider the proposed sale to Volvo will be held on August 20, 1981, notwithstanding the absence of a plan of reorganization;

2. Upon approval, if any, of the said transaction, Gemini and/or White shall segregate for the benefit of the Gemini estate the sum of $3,500,000, subject to further Order of this Court.

3. In the absence of a plan or plans of reorganization being filed for White Mo-

tor, White Credit, Gemini or other affiliates on or before August 31, 1981, the Court may be required to either (a) terminate the exclusive period as to one or more debtors or (b) further empower the examiner(s) to execute the duties contained in 11 U.S.C. § 1106(a)(5).

SO ORDERED.