**In re GRANT BROADCASTING OF PHILADELPHIA, INC. (Jointly administered with Grant Broadcasting System, Inc., Channel 33, Inc., and Grant Broadcasting of Chicago, Inc., and Grant Broadcasting of Chicago Limited Partnership), Debtors.**

**Bankruptcy No. 86–05614S.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 2, 1987.

See also, Bkrtcy., 71 B.R. 376.

Marc J. Sonnenfeld, Jami Wintz McKeon, Philadelphia, Pa., for debtors.

Nathan B. Feinstein, Lawrence G. McMichael, Philadelphia, Pa., for Secured Noteholders.

Howard Glassman, Leon Forman, Philadelphia, Pa., for Programmers.

Susan L. Thorner, Hughes, Hubbard & Reed, New York City, for Viacom.

Mary Walrath, Philadelphia, Pa., for Creditors' Committee.

Doron A. Henkin, Philadelphia, Pa., for Viacom.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

Presently before us in the mass of contested matters which have arisen in the early stages of the proceedings in these jointly-administered Chapter 11 cases filed by three (3) subsidiary independent UHF television stations located in Philadelphia, Miami, and Chicago, respectively, on December 8, 1986; by the partnership that owns the Chicago Station on January 27, 1987; and by their parent broadcasting system on December 10, 1986, is an explanation of our Order of February 26, 1987, approving an Application by the Debtors for Approval of Settlement Agreement between Debtors and Viacom International, Inc. (hereinafter referred to as "Viacom") entered into on January 30, 1987. The Settlement Agreement was effected to resolve Motions filed by Viacom "for an Order Directing the Return of Property in Possession of Debtor" on December 19, 1986; and for Relief from the Automatic Stay and for an Order Directing the Return of Property in Possession of Debtor on January 7, 1987, respectively. Because we found that, upon consideration of the well-established criteria for determining whether to approve same, the settlement was well within the low threshold that must be cleared to obtain Court sanction, we granted the Application, although our Order specifically clarified those portions which might be considered onerous to the Debtors if read in a way different from that which Counsel for both parties testified had been intended.

On the afternoon of January 8, 1987, we began taking testimony on the Viacom Motions, the first of which was the earliest of the subsequent avalanche of Motions filed by various creditors seeking various types of relief from the Debtor.[1] By agreement of the parties, the next day we embarked on taking evidence in a consolidated hear-

---

1. The full panoply of contested matters is described in detail at pages 2–3 of our Opinion of this date addressing the Debtors' Motion requesting use of cash collateral and a Motion seeking relief from the automatic stay imposed by the bankruptcy which was filed by the Debtors' secured creditors.

ing on the Debtor's Motion to use cash collateral, per 11 U.S.C. § 363(c)(2), and a Motion by a group of investors in the station, secured by certain notes (referred to hereinafter as "the Secured Noteholders") for relief from the automatic stay per 11 U.S.C. § 362(d) (referred to hereinafter as "the Consolidated Motions").[2] The parties also agreed that the hearing on the Viacom Motion would resume on January 16, 1987, and be tried to conclusion before we returned to consider the Consolidated Motions.

However, on January 16, 1987, Counsel for Viacom and the Debtors advised us that they were close to reaching an agreement and preferred to utilize the time allotted to them (the afternoon of that day) to negotiate. At the end of that day and when we resumed the Consolidated Hearings, we received constant reports that the settlement negotiations continued to approach finalization. In fact, the Settlement Agreement before us, although dated January 30, 1987, was apparently not consummated until February 2, 1987.

However, we do note that, over the Objection of the Debtors, we permitted Counsel for the Secured Noteholders to question the principal of the Debtors, Milton Grant, concerning the terms of the then-incipient agreement on January 26, 1987, in the course of the hearing on the Consolidated Motions. (Transcript of Trial, January 26, 1987, at 66–68, 78–79, 108, 114). We note that, at that time, Mr. Grant was asked about the terms of this Agreement by Counsel for not only the Secured Noteholders, but also by Counsel for the other two (2) entities opposing the Settlement Agreement, a large group of unsecured creditors who, with the exception of Viacom, represent virtually all other entities who have provided programming to the Debtors' stations (referred to hereinafter as "the Programmers"); and a group of other trade creditors (referred to hereinafter as "the Trade Creditors"). We note that Mr. Grant's description of the agreement on January 26, 1987, was consistent with all of

the significant terms of the ultimate Settlement Agreement, i.e., the elimination of over one-third of the arrearages owed, an extension to a term of over five-and-one-half years over which to make payment, providing all of the Debtor stations the right to terminate the contracts concerning about ten (10%) percent of the programming to which they were previously committed, and a right to cancel all of the contracts of the Chicago station within sixty (60) days of the date of approval of the Order. (*Id.* at 66–68).

The subject of the instant settlement again arose during the hearing on the Consolidated Motions on February 2, 1987. (Transcript of Hearing, February 2, 1987, at 20–22). At that time, Counsel for the Debtors reported that the settlement in issue had been reached and that unsigned copies of the Settlement Agreement would be distributed that day to all other Counsel. All Counsel present, representing, as far as we know, all of the creditors interested in participation in these proceedings, agreed to a schedule for presentation of the Settlement Agreement to the Court for approval which contemplated that any objections would be filed on or before February 11, 1987, and that a hearing, if necessary, would be conducted on February 12, 1987. Although Mr. Grant had recited practically all of the significant terms a week before, and hence all Counsel had a considerable period of time to reflect on same, no objections were raised to the substance of the Settlement Agreement at that time, and we must confess that we were surprised by the fact that these Objections were mounted. We attribute this development, in part, not to the lack of fairness of the Settlement Agreement, but the uncertainty that existed in the case due to the existence of numerous unresolved matters, and the desire of all interested parties to keep as many options open as possible pending the outcome of those matters. We believe that our decision on the Consolidated Motions,

**2.** These Motions and the interests of the parties thereto are described in more detail in our

Opinion filed this day addressing these motions.

as well as this decision, will now give shape to these proceedings.

By February 11, 1987, the Secured Noteholders, the Programmers, and the Trade Creditors had all filed Objections to the Settlement Agreement, and a hearing process which extended over four trial days, February 12, February 17, February 20, and February 23, 1987, ensued. Although the Settlement Agreement contained a provision that it would be invalid if it were not approved by the Court on or before February 28, 1987, we were extremely indulgent in allowing the objecting parties to pursue all lines of attack that they considered relevant to determining whether this rather short and simple (eight page, fourteen paragraph) Settlement Agreement should be approved. Over vigorous objection by the Debtors, we decided a close evidentiary question in favor of the Secured Noteholders, and allowed their Counsel, notwithstanding Federal Rule of Evidence 408,[3] to inquire of the Debtors' officers and the Debtors' Counsel concerning their negotiating positions at various phases in the negotiation process, in order to allow all parties to develop any possible evidence of collusion, naivete, or just bad bargaining tactics on the part of the Debtors. Over equally vigorous objection by Viacom, we allowed Anthony Hoffman, an expert witness called by the Secured Noteholders, to testify concerning internal financial developments within Viacom, and how those might have been played upon by the Debtors to develop a better result in the negotiations or in any subsequent bargaining process if the Settlement Agreement were rejected. Both Counsel negotiating the Settlement Agreement, E. Clive Anderson, Esquire, on behalf of the Debtors, and Susan L. Thorner, Esquire, on behalf of Viacom, were called to the stand by the Secured Noteholders. However, despite this wide range of inquiry, the objecting parties, particular-

ly the Secured Noteholders and the Programmers, only succeeded in convincing us that their main motivation in opposing the Settlement Agreement was service of their own partisan agendas of wresting control of the Debtor stations from its present management to serve as an example to other entities in this troubled industry who were contemplating following the Debtors in the bankruptcy route.

When it became apparent that the extended hearings were approaching the February 28, 1987, witching hour of the Settlement Agreement, we issued an Order of February 18, 1987, to which no party excepted at the time, setting February 23, 1987, as the deadline for completion of testimony; February 24, 1987, as the deadline for the filing of Briefs by the respective parties; and February 26, 1987, as the deadline for our decision-making. In so doing, we were not merely accommodating time-pressures created by Viacom and the Debtors in setting the February 28, 1987, deadline in the Settlement Agreement. Rather, we were acting in recognition of the fact that it was necessary to bring at least *this* matter to a head and give direction to these proceedings promptly. We indicated that, since the dates between which we would have to review the Briefs and render our decision were mid-week dates when our responsibilities including preparing for, hearing, and disposing of close to one hundred (100) matters each day, we would, in all probability, be unable to do other than issue our Order and follow it with an explanatory Opinion a few days later.

Nevertheless, on February 23, 1987, we allowed the Secured Noteholders to prevail upon us to allow an extra day in the preparation and filing of Briefs, and we indicated that this would probably require us to postpone our decision-making for another day.

---

3. Our reasoning was based largely on the holding in *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1124 n. 20 (7th Cir.1979), that such negotiations could be explored in determining whether a class settlement fairly and adequately protected the class. However, we considered this question particularly close because there is no element of impro-

priety in the nature of the settlement negotiations alleged here as there was in that case, *id.* at 1126, and the court, in exercising its authority under Federal Rule of Civil Procedure 23(e), as it was there, must be extremely vigilant, as the rights of absent unnamed class members are at stake, unlike here.

In typically lawyer-like fashion, from approximately 4:30 P.M. on February 25, 1987, into the night, the parties' respective Counsel presented us with a stream of five Briefs, from the Programmers, the Secured Noteholders (the second of two Briefs), the Trade Creditors, Viacom, and the Debtors. We read all of the Briefs and read as well almost every case cited therein by the parties opposing the Settlement Agreement. The weight of reason and authority was so overwhelmingly decisive that we were, without feeling any time-pressures, able to issue an Order approving the Settlement Agreement on the next morning, February 26, 1987. During a colloquy with Counsel for all interested parties who were before us on approximately a half-dozen minor Motions relative to the cases that morning, Counsel for Viacom urged us to amend our Order to specifically approve a Stipulation and Order which had been attached to the Settlement Agreement and, when all Counsel present agreed that the contents of this document were consistent with the Settlement Agreement itself, we did so. We also indicated orally to Counsel for the Secured Noteholders and the Programmers that we would not grant any stay of our Order pending Appeal, as we felt that any delays were against the interests of all parties. We later learned that an appeal and a request for a stay had been filed in the District Court that day. The desire to assist the District Court in understanding our reasoning process and the case in general to give perspective to the Settlement Agreement, has caused us to expedite the filing of this Opinion and that addressing the Consolidated Motions as well. The Order of February 26, 1987, promised, on its face, that we would issue an Opinion setting forth our findings supporting the Order on or before March 6, 1987. This Opinion, and the Opinion on the Consolidated Motions, are filed prior to this deadline, on March 2, 1987.

The law in this area, in comparison to that pertinent to the issues presented by the Consolidated Motions, is relatively well-settled. We shall therefore reverse the classic order of presentation of our Opinion in the form of Findings of Fact, followed by Conclusions of Law, followed by a Discussion, which we employed by rendering our decision on the Consolidated Motions. We shall herein discuss first the law which we believe to be controlling, dispose of the counter-arguments which we believe to be misplaced, and then set forth the Findings of Fact on the matters which we deem to be controlling in reaching our conclusion that the Settlement Agreement should be approved.

## B. PERTINENT LEGAL PRINCIPLES

The reported cases are remarkably consistent in establishing that there are but four considerations which a Court must address in determining the fairness, reasonableness, and adequacy of a settlement:

(a) The probably of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*See, e.g., In re A & C Properties,* 784 F.2d 1377, 1381 (9th Cir.1986); *In re Flight Trans. Corp. Securities Litigation,* 730 F.2d 1128, 1135 (8th Cir.1984), *cert. denied,* 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985); *In re Jackson Brewing Co.,* 624 F.2d 605, 607 (5th Cir.1980); *Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929); *In re Neshaminy Office Bldg. Associates,* 62 B.R. 798, 803 (E.D.Pa.1986) (per NEW-COMER, J.); *In re Patel,* 43 B.R. 500, 504 (N.D.Ill.1984); *In re Blue Coal Corp.,* 47 B.R. 758, 761 (Bankr.M.D.Pa.1985); *In re Carla Leather, Inc.,* 44 B.R. 457, 466 (Bankr.S.D.N.Y.1984); *In re Hallet,* 33 B.R. 564, 565–66 (Bankr.D.Me.1983); and *In re Marshall,* 33 B.R. 42, 43 (Bankr.D. Conn.1983).

Furthermore, as we stated in our recent Opinion in *In re Morrison,* 69 B.R. 586, 592 (Bankr.E.D.Pa., 1987), although the objections of creditors to the settlement of a controversy must certainly be carefully considered,

it is well-established that the objecting creditors may not substitute their judgment for that of the Trustee,[4] but merely requires the Court " 'to see whether the settlement "falls[s] below the lowest point in the range of reasonableness." ' " *In re Carla Leather, Inc.,* 44 B.R. 457, 465–66 (Bankr.S.D.N.Y.1984) (quoting *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.) *cert. denied sub nom. Cosoff v. Rodman,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (quoting, in turn, *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom. Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972)).

We do recognize, however, that, although it would defeat the cost-effectiveness of encouragement of settlements to require courts reviewing settlements to conduct a full trial on the merits of the underlying controversy before deciding whether a settlement of the controversy should be approved, we have a "duty ... to determine that a proposed compromise forming part of a reorganization plan is fair and equitable." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). To this end, it was important for the Debtors to make a full record on this Application and for this Court to carefully consider the evidence presented by the Debtors in support of the Settlement Agreement, as well as allow the objecting creditors latitude in cross-examining these witnesses and calling witnesses of their own, in deciding whether to approve the Settlement Agreement. *Compare id.* at 432–41, 88 S.Ct. at 1167–72; and *Neshaminy, supra,* 62 B.R. at 803–04. We believe that the Debtors met their burden, that we

properly performed our duty of carefully weighing the fairness and equity of the Agreement, and we shall, in this Opinion, make specific Findings of Fact which support our conclusion that, weighing the pertinent considerations in assessing the fairness, reasonableness, and adequacy of the Settlement, the Debtors have in fact met their burden.

### C. ISSUES RAISED BY THE OBJECTING PARTIES

Several of the objecting creditors have raised certain legal issues which we believe should be disposed of before we render Findings of Fact relevant to the issues which we believe are pertinent to our disposition. These include claims that (1) the Settlement Agreement was not properly noticed to all creditors as required by Bankruptcy Rules 9019(a) and 2002(a); (2) The Settlement Agreement violates the Sherman Anti-Trust Act, 15 U.S.C. § 1; (3) The Settlement Agreement constitutes an improper, *de facto* reorganization of the debtor; (4) The Settlement Agreement impermissibly contemplates payment of prepetition debts to Viacom; and (5) The Court is bound to honor the objections of creditors.

We are fully aware that Bankruptcy Rules 9019(a) and 2002(a) state that a Debtor must ordinarily provide twenty (20) days notice to all creditors before the court may approve a compromise or settlement. We further note that we consider satisfaction of notice requirements as very important and not to be compromised in the least unless exigent circumstances justifying an alteration are present.

■ On the other hand, we must observe that Bankruptcy Rule 9006(c)[5] expressly

---

4. Since no Trustee has been appointed in these cases we note that the Debtors-in-Possession are statutorily imposed with "all the rights ... of a trustee." 11 U.S.C. § 1107(a). We are quite aware that the Programmers have moved for the appointment of a Trustee, per 11 U.S.C. § 1104, but no hearing on this matter has been scheduled. However, to the extent that this Motion is based on alleged mismanagement by the Debtors, as we indicated in our Opinion on the Consolidated Motions, slip op. at 13–14, ¶ 32, we find no factual basis for such a Motion.

We also note that the Secured Noteholders and the Trade Creditors have specifically declined to join the Programmers in that Motion.

5. Bankruptcy Rule 9006(c)(2) provides that the notice-period cannot be reduced in actions taken under certain rules. Rules 9019(a) and 2002(a) are not among these enumerated in Rule 9006(c)(2), and therefore it is clear that reduction of time-periods under these rules is permissible.

provides that a bankruptcy court "for cause shown may in its discretion with or without motion or notice" reduce the time period for notice in a matter within the scope of Bankruptcy Rules 9019(a) and 2002(a). In exercise of its discretion per Bankruptcy Rule 9006(c), a court must consider, primarily, the prejudice that potentially would result to parties entitled to notice if a reduction is effected, and weigh this against the reasons for shortening the period.

■ In the instant situation, the Court provided actual notice of the procedure to be followed in considering whether to approve the Settlement Agreement to Counsel representing all of the parties who have participated in this action on February 2, 1987. See page 4 *supra*. All Counsel concurred in this procedure and in fact did not raise any objection to the reduction of notice until the outset of the hearings on the Debtors' Application to approve the Settlement Agreement on February 12, 1987. Given this scenario, the Court concludes that this argument was raised not in the good faith belief that the rights of any party had been prejudiced, since Counsel actively representing the interests of all known classes of creditors had clearly had sufficient notice of the matters in issue and the proceeding, but rather as a technical defense to block approval of the Settlement Agreement. As we indicated *supra*, we deemed it vital to act on this Application and give direction to these proceedings promptly, and dispatch of Notice, on February 12, 1987, would have thrown us back at least a month in this process. Under these circumstances, and having been presented with no specific allegation that any interested party was in fact unfairly prejudiced, we can give no weight to this objection.

■ Next, the Secured Noteholders alone argue that the aspect of the Settlement Agreement which renders the Debtors responsible for retaining and paying for about ninety (90%) percent of the programming which they originally purchased, unless they exercise their option to reject all of the Viacom programming used by the Chicago station, constitutes illegal "block booking" in violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1. *See United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962).

The patent frivolity of this argument should be readily apparent, and the very advancement of this contention as their opening and principal argument suggests an element of desperation in the position of the Secured Noteholders. There is no evidence that the Debtors did not want to keep *all* of the Viacom programming which they earlier purchased in arm's length negotiations, or that they were required to purchase any particular program as a condition for purchasing another, either in the initial negotiations or in making their choices as to which contracts to terminate. It is clear to us that only difficult financial circumstances have caused the Debtors to desire to return *any* of the programming purchased from Viacom.

■ Of somewhat greater merit is an argument vigorously advanced as their initial and principal argument by the Programmers and faintly echoed by the Secured Noteholders and the Trade Creditors that this Agreement is so large and substantial in proportion to the other financial obligations of the Debtors that it constitutes a *de facto* plan of reorganization which, if approved, would be effected without the full procedural steps for plan confirmation set forth in 11 U.S.C. §§ 1125–41.

However, it is clear that the cases cited by the Programmers in support of this principle are distinguishable, because they involve instances where, unlike here, the respective Debtors were proceeding under 11 U.S.C. § 363(b) and proposed making a complete sale of all or most of their assets prior to the confirmation of a Plan. *See In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir.1986) (Debtors proposed entry into new lease transations of tremendous proportions after bankruptcy); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir.1983) (Debtors proposed post-petition sale of most important asset); *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983) (Debtors proposed transfer of cash and considerable assets to another entity in exchange for

participation in entity); and *In re White Motor Credit Corp.*, 14 B.R. 584 (Bankr.N. D.Ohio 1981) (Debtor proposed sale of virtually all assets to purchaser). See *also Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir.1986) (Pre-confirmation sale of all assets of Debtor permitted where sound business purpose dictates such action); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) (Pre-confirmation sale of all assets of Debtor proposed on date of filing reversed pending finding by bankruptcy court on issue of good faith of purchaser, who was apparently prepared to employ Debtor's principal); *In re Solar Mfg. Co.*, 176 F.2d 493 (3d Cir.1949) (Pre-confirmation sale of all assets of Debtor permitted only if emergency exists); and *In re W.R. Brown, Inc.*, Bankr. No. 86–04108S (Bankr.E.D.Pa., Order filed Sept. 19, 1986) (This Court allowed pre-confirmation sale of all assets of Debtor within thirty (30) days of bankruptcy filing where emergent circumstances existed).

We believe that the matter before the Court here, where the Debtors are effectively assuming pre-petition executory contracts with Viacom with certain modifications which the Debtors deem to be to their benefit, is a different situation from that presented by a request for court approval of a post-petition sale or lease of assets which is contemplated by § 363(b). As Viacom points out in its Brief in support of the Application, the Fifth Circuit, in a decision made in the time-frame between the decisions in *Braniff* and *Continental*, expressly recognized this distinction in *Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1312–13 (5th Cir.1985). Judge Newcomer, in his *Neshaminy* decision, rejected a similar contention, and stated that he did "not believe it is proper to equate the settlement of this controversy over conflicting claims ... with the sale of that property." 62 B.R. at 805.

We believe that this distinction between agreements to settle controversies arising out of pre-petition contracts and new, post-petition transactions is important, and, we clearly characterize the matter before us as the former.[6] Were this distinction blurred, it would be impossible for a debtor to ever resolve a controversy with a creditor with whom it had significant pre-petition contractual relations prior to the confirmation of a Plan. Given the need to resolve a motion pursuant to 11 U.S.C. § 362(d), like Viacom's second Motion, promptly, see 11 U.S.C. § 362(e), a contrary rule would conceivably require a debtor to formulate a Plan within (30) days of the filing of such a Motion if the debtor wished to make peace with the creditor.

We therefore reject the Programmers' argument that approval of this Settlement Agreement would allow circumvention of the Code provisions setting forth the process which must be followed to obtain confirmation of a Plan. Rather, it is apparent to us that approval of this Settlement Agreement is an important and necessary first step for the Debtor in formulating a Plan. Having a firm contract with one programmer in place, the Debtors will be in a much better leverage position in negotiating with other programmers and will be much more likely to file their Plan by June 26, 1987, as we direct them to do in the order deciding the Consolidated Motions. Moreover, it is apparent to us that the principal reason that the Programmers so vigorously oppose this Settlement Agreement is their recognition that the breaking of their ranks by Viacom will considerably strengthen the Debtors' leverage in dealing with the rest of the Programmers. While this is of course detrimental to the interests of the Programmers, it is of great benefit to the interests of the Debtors in effecting their reorganization.

 The Programmers, again with some support from the other objecting parties,

---

6. In so doing, we acknowledge that Viacom's position at the time of trial on its Motion was that it had in fact terminated its contracts and that any further dealings with the Debtors must be in the nature of a new contract. See page 402, Finding of Fact 26 *infra*. However, the

Debtors argued to the contrary, and despite our reservations about the strength of their arguments, until this Court in fact ruled on the status of the contracts, they must be considered as executory contracts of the Debtors.

contend that the Settlement Agreement violates 11 U.S.C. § 507 because it provides Viacom with favored treatment of its pre-petition claims. There are several short answers to this. First, if any of the terms of the Settlement Agreement do in fact violate the Code, our Order approving the Agreement expressly states, as is recognized in paragraph 13 of the Settlement Agreement itself, that such terms will not be enforced. Secondly, it is not clear that, in giving up a right to so much as file a claim for pre-petition delinquencies of approximately $6.4 million in exchange for payment of $2.05 million over a period of a year, Viacom has not sacrificed far more than it will be getting. Thirdly, as the testimony of Richard Leberman, the Debtor's Director of Finance, pointed out, the Settlement Agreement resulted in a total payment to Viacom of less than the full amount that the Debtors would otherwise have to pay for only post-petition product. (See Transcript of Hearing, February 17, 1987, at 117–21, and Exhibit "D–25"). Fourthly, the creditors have but one authority for this objection, which suggests at its core that a debtor cannot offer post-petition financial consideration in exchange for the waiver of rights by an opposing party. That authority is a clearly distinguishable case, *In re Rajneesh Neo-Sannyas Int'l Commune,* 59 B.R. 49 (Bankr.D. Ore.1986), wherein a debtor sought to pay a certain creditor in full, in preference to even secured creditors, as a condition for an agreement that an involuntary case be dismissed. Fifthly, the fact that Viacom was, with one exception, the only creditor to declare a pre-petition default against the Debtors; the only creditor to embark on exercising its remedies upon default pre-petition; and proceeded as the first party to seek relief from the stay against the Debtors, it is hardly surprising that they should receive different treatment than the other Programmers. Sixthly, the fact that the Debtors here can pick and choose among which contracts to accept or reject is one of their most significant rights attained by filing bankruptcy. See 11 U.S.C. § 365(a). It is hardly violative of the Code to accept one executory contract, with the attendant

duty to cure the pre-petition default, see 11 U.S.C. § 365(b)(1)(A), and reject another.

■ Finally, all of the objecting creditors suggest that the fact that they *all* object to the Settlement Agreement renders the Court powerless to approve it. While we totally agree and recognize that it represents the fourth prong of the considerations which this Court must make in deciding whether to approve this Settlement to ascertain that "proper deference" is given to the "reasonable views" of creditors, we cannot agree to the corollary that we are compelled to disapprove the instant Settlement Agreement on the basis that creditors, for largely reasons based on their own self-interests, can sabotage a settlement which is in the best interests of the Debtor. The cases cited by the objecting parties on this issue are clearly distinguishable for the following respective reasons: *In re Hydronic Enterprise, Inc.,* 58 B.R. 363 (Bankr.D.R.I.1986) (trustee seeking to settle $105,000.00 claim concerning which he conceded that a favorable judgment was likely for $10,000.00); *Hallet, supra,* (trustee "presented no evidence" to support compromise of potential $154,000.00 claim for $10,000.00); and *Marshall, supra* (creditors with ninety percent of creditor-interest agreed to finance litigation for the debtor in lieu of compromise).

We totally agree with the following analysis of the positions of the Programmers and the Secured Noteholders, as provided at pages 18–19 of the Brief of the Trade Creditors who, it should be noted, although with somewhat less vigor than the other objecting parties, also objected to the Settlement Agreement:

It is noted that positions of the Secured Noteholders and Programmers may be somewhat discounted in view of the bias of the objecting parties. Specifically, the Secured Noteholders have opposed the continued operation of the Debtors in connection with applications for the use of cash collateral and for stay relief. The Secured Noteholders have, in fact, moved to replace the management of the Debtors with their own nominee. Obviously, their opposition to the proposed

Settlement Agreement is to be discounted where personal gain is the motive for the objection.

The Programmers also have an interest in seeing approval of the Settlement Agreement denied. The Programmers consist of companies in the same business as Viacom, who may profit if the Debtors and Viacom cannot come to an agreement. Similarly, it can be inferred that the Programmers, who have presented a united front in their dealings with the Debtors, resent Viacom's initiative in individually striking out for the best deal it can get.

These observations, of course, do not explain the stance of the Trade Creditors. However, the debt obligations of the Debtors to these creditors totals about $28 thousand, in contrast to the debts of approximately $191 million and $90.5 million allegedly owed by the Debtors to the Programmers and the Secured Noteholders, respectively, and hence the issue of the magnitude of the claims of the objecting creditors is lost if we discount the bias of the Programmers and the Secured Noteholders in this analysis. The Trade Creditors presented no evidence to rebut the testimony of the Debtors' Officers that this Settlement Agreement does greatly benefit the Debtors' interests. It is this testimony to which we now turn in formulating our Findings of Fact which make up most of the balance of this Opinion.

## D. FINDINGS OF FACT

1. The Debtors are (a) Grant Broadcasting of Philadelphia, Inc. (hereinafter referred to as "Grant/Phila."); (b) Channel 33, Inc. (hereinafter referred to as "Grant/Miami"); (c) Grant Broadcasting of Chicago, Inc. (hereinafter referred to as "Grant/Chicago"); (d) Grant Broadcasting of Chicago Limited Partnership (hereinafter referred to as "the Partnership"); and the parent of the foregoing, (e) Grant Broadcasting System, Inc. (hereinafter referred to as "GBSI").

2. Grant/Phila., Grant/Chicago, and Grant/Miami all filed Petitions pursuant to Chapter 11 of the Bankruptcy Code on De-

cember 8, 1986. GBSI filed a similar Petition on December 10, 1986. The Partnership also filed a Petition on January 27, 1987.

3. Grant/Phila. owns and operates Channel 57, WGBS–TV, in Philadelphia. Grant/Miami owns and operates Channel 33, WBFS–TV, in Miami. Grant/Chicago is the general partner of the Partnership, the latter of which owns Channel 66, WGBO–TV, in Chicago. Grant/Chicago operates this station.

4. Channel 57, Channel 66 and Channel 33 are each independent UHF television stations, i.e., they are not affiliated with any larger network. Channel 33 began broadcasting in December, 1984; Channel 57 on October 10, 1985; and Channel 66 began broadcasting as a Grant Company on January 4, 1986.

5. The Debtor stations together, as of October 1, 1986, had entered into approximately 100 separate Program Licensing Agreements with Viacom, pursuant to which they obtained licenses to show certain television programs on the respective stations.

6. Prior to October 1, 1986, the Debtor stations had paid approximately $9 million to Viacom, but were in arrears on their contracts in the amounts of approximately $2.3 million in Philadelphia, $.75 million in Miami, and $1.7 million in Chicago, or a total of about $4.75 million.

7. On October 23, 1986, Viacom, pursuant to certain provisions in the Program Licensing Agreements, wrote to each of the Debtor stations indicating that they were terminating all or most of the Agreements, and that, *inter alia*, the prints from each program licensed should be returned to Viacom immediately and that the Debtor stations were to cease and desist from playing them immediately.

8. On November 3, 1986, Viacom's counsel wrote again to each of the Debtor stations, confirmed that the Agreements had been terminated, and warned that further exhibition of the licensed programs would result in legal action.

9. On November 5, 1986, Drew Pfeiffer, the Director of Programming of GBSI, responded with a letter indicating that the Debtor stations were "doing what they could" to discontinue use of Viacom's product, but suggesting that the Debtor stations would continue to play certain of Viacom's product, at least until November 14, 1986, when a meeting of all program venders of the Debtor stations was assembled in Los Angeles.

10. No agreement was reached at the meeting on November 14, 1986, and, with the exception of Grant/Chicago, the Debtor stations took most of their Viacom programming off the air until after the bankruptcy filings in December, 1986.

11. While the Debtors answered and vigorously opposed the Viacom Motions, filed on December 19, 1986, and January 7, 1987, respectively, at no time did they allege that there was any affirmative act on the part of Viacom which would have countermanded their termination of the Licensing Agreements prior to the negotiation and consummation of the Settlement Agreement.

12. In late December, 1986, the Debtor stations made an offer of settlement to Viacom which contemplated the return of about half of the Viacom product on all stations. Counsel for Viacom rejected that offer and tendered no counter-offer.

13. A hotly-contested hearing on the Viacom Motions was commenced on the afternoon of January 8, 1987, and Viacom completed its case and rested. Over objection from Viacom's Counsel, who wished to proceed to finish the matter that evening or the next day, the hearing was continued until January 16, 1987.

14. On the evening of January 15, 1987, the Debtors reopened the negotiations by tendering new offers in the form of a letter to Viacom's attorney, which contempleted termination of twenty (20%) percent of the Viacom Licensing Agreements, and an extension in the time of payment from approximately three more years to approximately five more years; or, in the alternative, retention of all contracts and an extension to approximately six and a half years in which to make payments.

15. During the afternoon of January 16, 1987, the parties, per E. Clive Anderson, Esquire, on behalf of the Debtors, and Susan L. Thorner, Esquire, on behalf of Viacom, engaged in negotiations which were occasionally heated, but which ultimately resulted in movement by both sides on the issues of the amount of programming licenses that the Debtor stations could terminate and the amount and timing of payments for arrearages. The basic terms of the ultimate Settlement Agreement were reached that day, and were consistent with testimony given by the Debtors' chief executive officer, Milton Grant, concerning the terms of the Settlement Agreement in the course of the hearing on the Consolidated Motions on January 26, 1987.

16. Drew Pfeiffer testified that Viacom product was "unique" due to the wide variety of product which was presented and that most Viacom products were "evergreens," i.e., products which tended to retain their value over a substantial period of time. Mr. Pfeiffer's characterization of the nature of the Viacom product was not disputed by any witness, although Anthony Hoffman, the expert witness of the Secured Noteholders, observed that much of the product was dated (see Finding of Fact 24 *infra*).

17. Mr. Pfeiffer further testified that availability of the Viacom programming would assure the Debtor stations of stable and adequate programming and allow them to negotiate from a position of strength with the other programmers.

18. Also testifying for the Debtors were the managers of Channel 57, Channel 33, and Channel 66, who were, respectively, John Gardner, Donita Welsh, and Gail Brekke, all of whom testified that resumption (or continuation, in Chicago, which had never ceased use) of Viacom programming was necessary to the operation of their respective stations.

19. The Debtors also called Richard Leberman, the Director of Finance of the Debtor-parent. Mr. Leberman testified that the Settlement Agreement contem-

plated payment for all stations of approximately $500,000.00 monthly to Viacom out of a goal of about $2 million monthly for programming costs, and hence was clearly within the Debtors' financial capacity to fulfill. He also presented an Economic Analysis (Exhibit "D–25") which indicated that the Settlement Agreement would result in a savings of approximately $9.8 million or about 31.4 percent to the Debtors in comparison to the terms of the original Viacom contracts.

20. All of the testimony of the Debtors' witnesses recited in paragraphs 16 to 19 *supra* stood up under cross-examination by three opposing counsel and is totally credited by the Court.

21. The Programmers called one expert witness, Eugene Wilkin, who is presently employed as a private broadcast program consultant. Mr. Wilkin testified that he would not recommend that a station depend on any one programmer, and that much Viacom product receives consistently lower ratings than some of the products of other programmers.

22. The Court attributes very little weight to the testimony of Mr. Wilkin. Much of his analysis was expressed in gross generalities. He was confused and occasionally emotionally upset by cross-examination. His experiences have been with stations and markets which are much smaller than Philadelphia, Chicago, or Miami. The level of success of the stations with which he had worked in the broadcasting business has been considerably more modest than that of the Grant stations, and hence we would be totally unwilling to accept the assessments of Mr. Wilkin in preference to those of Messrs. Pfeiffer or Gardner, Ms. Welsh, or Ms. Brekke.

23. The Secured Noteholders called one expert witness, Anthony Hoffman, an investment banking specialist in the broadcast industry employed by Union Bank of Los Angeles as an advisor in making investments in the broadcasting field, who had previously testified as an expert regarding the value of the Debtor stations in the course of the hearings on the Consolidated Motions.

24. Mr. Hoffman testified that Viacom product is rather dated and that it was doubtful whether any of the other stations in the Philadelphia market would want it (no testimony was provided as to the other markets). He stated that he thought that postponing payments would not be to the long-term advantage of the Debtor stations because they would then lack funds in the later years to purchase fresh programming. He further testified that Viacom's management was presently engaged in an intra-corporate struggle which may have made Viacom susceptible to acceptance of an offer less attractive than the present Settlement Agreement as long as some income was realized by Viacom from the Debtor stations, although he later revealed that his knowledge of the assets of Viacom was probably in error by as much as $1 billion and that the amounts involved in these contracts would not be a material factor in the developments in Viacom's financial picture.

25. While the Court places a far higher value on the testimony of Mr. Hoffman than that of Mr. Wilkin, none of his testimony tended to discredit that of the Debtors. The statements raised by Mr. Hoffman do no more than suggest that it is possible that the Debtors could have made a better deal, which is of course always possible.

█ 26. The probability of ultimate success of the Debtors in their litigation with Viacom was very low, since Viacom had apparently terminated its contracts prior to the Debtors' bankruptcy filings. As we recently held in *In re Mason, Mason v. Benjamin Banneker Plaza, Inc.,* 69 B.R. 876, 881 (Bankr.E.D.Pa.1987), an

> interest which has been terminated prior to the bankruptcy filing cannot be revived by the bankruptcy filing. *See e.g., In re Best Film & Video Corp.,* 46 B.R. 861, 869–70 (Bankr.E.D.N.Y.1985); *In re Heaven Sent, Ltd.,* 37 B.R. 597, 598 (Bankr.E.D.Pa.1984) (per GOLDHABER, CH.J.); and *In re Anne Cara Oil Co.,* 32 B.R. 643 647–48 (Bankr.D.Mass.1983).

This factor weighs very heavily in determining that the Settlement Agreement should be approved.

 27. The element of difficulty of collection is not a factor either way in this matter, as this is not a collection action by the Debtors.

28. The element of the complexity of litigation and the additional expenses, inconvenience, and delay which would result if the Court failed to do so strongly favors approval of the Settlement Agreement. It is important to the Debtors to put the first building block of their reorganization process into place, especially in light of the time-deadlines set forth in our Order in reference to the Consolidated Motions. If the Settlement Agreement had been disapproved, the Debtors would have been compelled to litigate a likely losing battle in court or spend considerable additional time in renegotiating a new deal. As Viacom never approached the Debtors to attempt to negotiate a deal, it seems unlikely, as Mr. Hoffman suggested, that Viacom could remain anxious to renegotiate on terms less favorable to it.

29. While this Court accords deference to the creditors' views, we believe that most of the opposition to the Settlement Agreement arises from partisan concerns of the Secured Noteholders and the Programmers, each of whom has thus far sought to oppose the Debtors at every turn for fear of establishing precedent unfavorable to their interests, generally, in a troubled industry. In the long run, the Court believes that survival of the Debtors and other members of their industry is in the best interests of all creditors, and, further, that approval of this Settlement Agreement is essential to the survival of the Debtors.

30. The Court believes it is very important to consider that the Debtors could not obtain a product similar to that of Viacom in as good or better a deal elsewhere, and that the lack of such an opportunity for the Debtors cuts very strongly in favor of approval of the Settlement Agreement. We reach this conclusion on the basis of testimony of officers of the Programmers in other proceedings in this case that these parties resist and almost never succumb to any attempts to renegotiate or lower prices. Since Viacom is the only programmer which has been willing to make any such concessions to the Debtors to date, any concessions to be received are rare and hence valuable.

31. While it is always possible that the Debtors could have gotten a better deal, the Settlement Agreement is quite adequate, very timely, and hence eminently reasonable. The three of the classic four criteria relevant here in determining the fairness, reasonableness, and adequacy of the Settlement Agreement (see page 399 *supra*) are hence satisfied.

### E. CONCLUSION

It is upon the foregoing Findings of Fact and considerations that we based our Order of February 26, 1987. We firmly reiterate the conclusions set forth therein.