In re The PRESENT CO., INC., Debtor.

In re DANIELS TOBACCO CO., INC., Debtor.

Bankruptcy Nos. 91–23618 K, 92–20372 K.

United States Bankruptcy Court, W.D. New York.

June 8, 1992.

Francis E. Kenny, Robert E. Bramlet, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., for debtors.

Paul Traub, Traub, Bonacquist & Fox, New York City, for Official Creditors' Committee.

William J. Brown, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., Douglas H. Meal, Harold J. Marcus, Ropes & Gray, Boston, Mass., for Senior Lending Associates I, L.P., Mezzanine Lending Associates I, L.P., Mezzanine Lending Associates II, L.P. and Mezzanine Lending Associates III, L.P.

## OPINION AND ORDER

MICHAEL J. KAPLAN, Bankruptcy Judge.

Here the debtors seek leave, under Bankruptcy Rule 9019(a) to compromise for $280,000, all possible claims these estates might have against certain insiders. The official Creditors' Committee of Present Company, Inc. ("PCI") opposes. (There is no Creditors' Committee in the Daniels case.) Debtor PCI was a chain of catalog-type retail stores, as was its subsidiary, the debtor Daniels. (Daniels' stores were called Save–Rite.)

## THE PARTIES

The debtor PCI is a wholly-owned subsidiary of PCI Holdings, Inc. PCI Holdings is closely-held. More than 90% of its stock is held by four limited partnerships: Senior

Lending Associates I, Limited Partnership; Mezzanine Lending Associates I, Limited Partnership; Mezzanine Lending Associates II, Limited Partnership; and Mezzanine Lending Associates III, Limited Partnership. These entities are affiliated in various fashions with the "Butler" financial group. The limited partnerships are referred to in these proceedings as the "Funds" or the "Institutional Investors."

PCI had been publicly traded until PCI Holdings was created to acquire PCI in a Leveraged Buy Out ("LBO") in 1987. Thereafter some members of the PCI Board have also held positions on the boards of entities affiliated with Butler, and have held policy making positions within the Funds.

In 1989, Butler proposed that PCI acquire Daniels Tobacco Company, Inc., and this was done. This was not an LBO; the Funds loaned money to PCI with which PCI acquired Daniels, rendering Daniels a wholly-owned subsidiary of PCI.

On October 25, 1991, the Boards of Directors of PCI and PCI Holdings decided to liquidate PCI and Daniels. Shortly thereafter an unofficial Creditors' Committee was formed. The liquidation proceeded through the Christmas retailing season of 1991, and a distinct effort was undertaken by all parties to keep the matter out of Bankruptcy Court in order to conserve fees and expenses.

Nonetheless, involuntary petitions were filed on December 27, 1991, which the debtors did not contest. Orders for relief were entered against the debtors on February 11, 1992.

As of that date the liquidation was nearly complete. Nearly $27 million in cash is on deposit for distribution to unsecured creditors in the two cases. Total unsecured claims against the two estates are approximately $63.2 million. Unpaid expenses aside, then, creditors would receive approximately $.42 on the dollar.

Of the $63.2 million in total unsecured claims, approximately $48 million is alleged to be owed to the funds. Thus, 75% of everything available for creditors would go to the Funds, as unsecured creditors.

(There is nothing for the Funds as owners of the corporation that owns the debtor.) It may be said, therefore, that the Funds claim about $20 million of the $26.7 million on hand.

The remaining debt is of two types. The first is that of Chemical Bank which has unsecured claims of approximately $3.8 million—this is approximately 6% of the total, representing approximately $1.6 million of the distributable cash.

The final type of debt which represents 18% of all unsecured claims is held by "trade" creditors. Their $11.4 million in claims would receive about $4.8 million of the money on hand. Of that $11.4 million in claims, some $6 million are "merchandise creditors"—suppliers of resalable goods on credit, some of whose goods (arguably) yielded a portion of the $26.7 million cash on hand. The rest of the trade creditors are "overhead type" debt such as stipulated claims for damages for termination of store leases.

The chief executive officer of the debtors is Mr. Hicks. He was recruited by Butler in early 1991 to attempt a PCI turnaround. (PCI, like other retailers, had suffered a disappointing 1990 Christmas retailing season.) His three-year employment contract with PCI was guaranteed by Butler by means of a "put," under which it would be Mr. Hicks' option to demand employment with Butler in the event of PCI's demise. Since PCI's demise, that "put" was exercised and Mr. Hicks is now an officer of an affiliate of the funds as well as acting (on essentially a per diem basis) as the executive officer of what remains of the debtors.

The official Creditors' Committee in PCI is an active one. Its chairman (representing the Fisher Price Toy Company) and another member (representing the R.R. Donnelly Printing Company) have testified before the Court in opposition to the proposed compromise.

## PROPOSED COMPROMISE

During the non-bankruptcy liquidation efforts in the Fall of 1991, the then unofficial Creditors' Committee raised ques-

tion as to (1) whether the 1987 LBO of PCI or the 1989 acquisition of Daniels constituted or involved fraudulent transfers under the laws of the State of New York, and (2) whether the conduct of the funds in the Summer of 1991 was "inequitable" as to the trade creditors, such that in a bankruptcy proceeding the funds might be equitably subordinated to the trade creditors under 11 U.S.C. § 510.

As to the "non-insider" creditors (everyone but the Funds), the range of recovery on such claims is (at the extremes) anywhere from 0 to approximately $6.6 million. ($6.6 million is the difference between the $11.4 million total of non-insider claims and the $4.8 million they are to receive from the amounts on hand.)

Apart from such possible assertions of fraud or inequitable conduct against the Funds, there is the matter of the validity of $48 million of unsecured claims asserted by the Funds against the cash on hand. Might there be a basis to object to the allowance of the full $48 million? If, for example, the Funds' claims were shown to be miscalculated, and allowable only in the amount of $40 million, the $26.7 million would be divided among only $55.2 million in total claims, rather than $63.2 million, and all claims (including the Funds) would receive $.48 on the dollar rather than $.42 on the dollar.

Asserting any causes of action against the Funds or asserting any objections to the Funds' claims in this case could be very expensive. It is argued by the Funds that litigating fraud or inequitable conduct claims related to leveraged buyouts can readily cost $1 to $2 million in fees and costs.

The Funds assert that they have done nothing wrong and that they do not fear the outcome of any causes of action brought against them. They point out, however, the extraordinary cost to them of vindicating their rights in this case. Not only would they have to bear their own $1 to $2 million costs in defending any such causes of action, but the estate's costs of prosecuting the Funds would be paid for from the $26.7 million in which the Funds have a 76% stake.

Thus, even upon winning, the Funds would be "out" from one to two million dollars for their own defense costs, plus 76% of their opponents' costs. They refer to this as the "uneven playing field" that Title 11 of the United States Code produces when the dominant creditor is the potential defendant in an action by the estate.

$280,000 has been offered by the Funds to buy peace. All possible claims against the Funds would be released, and any objection to the Funds' claims against the estate would be foreclosed. The $280,000 would be distributed only among the $11.4 million of trade debt. Thus, "trade" would get approximately $.446 on the dollar rather than the $.42 on the dollar currently available.

All litigation costs would be avoided.

The debtors have sought approval of this compromise. As indicated above, the committee opposes.

## THE PROCEEDINGS ON THIS MOTION

The proponents offered numerous exhibits, but only two witnesses in support of the compromise. Both were involved in the decision to compromise any claims against the Funds, but neither were involved in the 1987 LBO or the 1989 acquisition of Daniels.

Mr. Hicks testified for nearly two days regarding the basis upon which the debtors support this compromise. Principally he believes there to be no merit to the potential fraud claims and he opposes any waste of the $26.7 million he has worked hard to bring together for the benefit of creditors.

Mr. Francis Kenny, Esq., duly appointed attorney for the debtors in possession, testified briefly to the same effect. The Court interrupted Mr. Kenny's testimony when it became evident that it was cumulative of Mr. Hick's testimony, and when the committee's counsel stipulated that Mr. Hicks and Mr. Kenny had "done the things they say they did" and had simply "reached conclusions that the committee disagrees with."

In other words, it is not disputed that Mr. Hicks and Mr. Kenny are skilled professionals of high integrity, who made investigation into the possible claims against the Fund, and who reached a determination that the $280,000 settlement should be approved.

What *is* disputed is whether their conclusion should prevail over the contrary view of the creditors' committee. (It is important to note that having had no firsthand knowledge of the 1987 and 1989 events, the witnesses could give only "opinion" testimony regarding those transactions, based only on such information as was made available to them by the Funds.)

The view of the committee is that what voluntary discovery there has been on the part of the Funds [1] is insufficient for creditors to reach an informed conclusion regarding the merits of the potential claims against the Funds; that cutting off any chance of pursuing such claims (by approving the compromise) ought not to be done without either (1) full disclosure to creditors and an opportunity to vote thereon, or (2) investigation by a fully-empowered, disinterested third-person, such as a trustee or examiner. (The Funds have asserted the view that the Committee is entitled only to such materials as the Funds have that pertain to the process by which the $280,000 compromise was reached; the Funds have refused to comply with the Committee's discovery demands and requests pertaining to the underlying transactions which would be the subject of the fraud and equitable

subordination claims that are here to be compromised.)

The Funds' view is that if I find that their offer is fair and reasonable, then I must protect them and the estate from needless invasion and approve the compromise.

## THE APPLICABLE LAW

When I interrupted the testimony of Mr. Kenny late in the third day of hearings on this compromise, I asked the debtors and the Funds whether, under the appropriate law, if the Court were to be fully convinced that Mr. Hicks and Mr. Kenny had reached a reasonable conclusion in determining to offer the $280,000 compromise for approval, could the Court nonetheless reject the compromise. They argued vigorously that that would constitute an abuse of discretion. The Funds requested an opportunity to brief that issue. I granted such leave, and directed the debtor and the Creditors' Committee to refrain from filing responsive briefs at this time.

A 104 page brief has been filed accordingly. Pages 1 through 4, 18 through 95 and possibly 96 through 104 exceed the scope of the leave granted by the Court, and will not be considered as anything but "proffer." Nevertheless, I have read the memorandum from cover to cover. It is an excellent exposition. I am in total and complete accord with the cases that it sets forth.[2] However, it totally ignores the fact that all of the cases that it cites arises in factual contexts that are thoroughly and

---

1. In an earlier decision, I refused to compel the Funds to produce anything at all in response to the Committee's discovery demands, in connection with this proposed compromise; I ruled that it was for the Funds to determine how much inconvenience and expense their $280,000 offer of compromise was worth to them.

2. In particular, the Court would like to note its accord with the standards espoused in the *In re Drexel Burnham Lambert Group, Inc.* case, 134 B.R. 493 (Bkrtcy.S.D.N.Y.1991). Therein, the Court stated that "[i] determining whether a settlement is "fair and equitable," i.e., within the range of reasonableness, Courts should balance:

a) the likelihood of success compared to the present and future benefits offered by the settlement;

b) the prospect of complex and protracted litigation if settlement is not approved;

c) the proportion of the class members who do not object or who affirmatively support the proposed settlement;

d) competency and experience of counsel who support settlement;

e) the relative benefits to be received by individuals or groups within the class;

f) the nature and breadth of releases to be obtained by officers and directors; and

g) the extent to which settlement is the product of arm's length bargaining. Id. at 497 (citations omitted).

decisively distinguishable from the case at bar. At least fifteen of the cases cited by the Funds as authority for the proposition that the applicable standards compel approval of this compromise on the record before this Court are cases in which the proponent of the compromise was a disinterested, duly-appointed bankruptcy trustee; or the compromise was of matters that were in litigation, and were the subject of full and complete discovery; or the compromise was proposed in a plan of reorganization upon which creditors voted; or the "arms-length" nature of the compromise was beyond dispute.[3]

3. First and foremost is the seminal case of *TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). That was a Chapter X case under the Bankruptcy Act; consequently there was a disinterested trustee proposing the compromise. (All Chapter X's had Trustees.) Moreover, the compromises were contained in a Plan of Reorganization approved by all creditors. (It was the Stockholders' Committee that opposed.)

Next, of course, is the critical Second Circuit decision, *In re W.T. Grant Co.*, 699 F.2d 599 (2d Cir.1983). This too concerned settlements proposed by a disinterested Trustee. (Indeed, footnote 9 of that decision attempts to lay to rest the myth that the trial judge merely rubber-stamped the Trustee's conclusions regarding the compromise he proposed.) It should also be noted that the compromises at issue were not binding on non-accepting creditors.

*Newman v. Stein*, 464 F.2d 689 (2d Cir.1972) (upon which the *W.T. Grant* standards were based) itself involved a settlement of stockholders' derivative suits after a full trial on one of the two theories asserted in the complaint. The Court stated that reviewing courts "have rejected approval of settlements where the trial court acted without sufficient facts concerning the claim ... or failed to allow objectors to develop on the record facts going to the propriety of the settlement.... But there is no problem here in these respects. The settlement occurred only after the completion of a full trial and neither objector has complained that the district judge subsequently prevented development of any further facts relevant to the settlement." Id. at 692–693 (citations omitted). (It is ironic that the Funds offered this case to me in support of the proposition that I should foreclose inquiry by the objecting creditors into the development of any facts relevant to the transactions sought to be compromised here.)

The Ninth Circuit decision in the case of *In re Blair*, 538 F.2d 849 (9th Cir.1976) (which the Funds cite for the proposition that liquidation cases, more than reorganization cases, cry out for compromises such as this) involved a compromise proposed by a trustee, negotiated over five months.

In one of the *Drexel Burnham* cases (that at 134 B.R. 493, Bkrtcy.S.D.N.Y.1991), the Court approved a settlement agreement proposed by the debtor and an insider over the objections of other insiders who alleged that they would suffer greater financial exposure by virtue of the proposed settlement. Under the settlement (known as the "Joseph Settlement"), the debtor and Joseph gave up their respective claims against each other in exchange for: Joseph's aid in tracking down assets and defending claims on behalf of the estate; Joseph's agreement to waive certain claims against the debtor including his $9 million "golden parachute" claim); and other details. The "Joseph Settlement" impacted on a separate settlement (the "Pooling Settlement") which was contingent upon approval of the Joseph Settlement. Under the Pooling Settlement there could be an additional $3 million generated by Joseph for the benefit of creditors, but this could enure to the detriment of those objecting to the Joseph Settlement. The Court pointed out that Joseph had an individual net worth of only $3.1 million apart from the $9 million "golden parachute" claim that he was waiving under the agreement. The Court stated that when it balanced the litigation costs so associated with prosecuting the debtor's mismanagement claim against Joseph and defending against Joseph's termination claim, there was a quid pro quo that made the settlement fair and reasonable and in the best interest of the estate.

Another *Drexel Burnham* case (that at 134 B.R. 499, Bkrtcy.S.D.N.Y.1991), involved a year-old adversary proceeding that was sought to be compromised. The adversary proceeding had been brought by certain former employees to declare their rights in an escrow fund containing more than $10.5 million. The Court characterized the debtor's "downside risk" as over $10 million. This settlement may be characterized as one in which the pot was basically spit in half. It was opposed by the pertinent creditors' committee. The Court expressly disagreed with the committee's view that a trial on that proceeding could be accomplished expeditiously and inexpensively. This was an adversary proceeding, more than 18 months old, *presumably a subject of full discovery*, the Court was fully familiar with the litigation in light of prior summary judgment motions that had been denied, and the Court considered the settlement to have been *fully bargained for* in "obvious extensive arm's length negotiations between the parties ... conducted over a significant period of time...." Id. at 507.

In the case of *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279 (Bkrtcy.S.D.N.Y.1990) a compromise was proposed as part of a plan of reorganization. It concerned a purported claim in connection with a $35 million loan to the debtor and the debtor's issuance, in return, of senior notes evidencing the obligation. Despite overwhelming acceptance of the plan, the Court

Here there has been no investigation by a disinterested trustee or examiner. No one supports this proposal other than the parties thereto (who are "insiders") and their counsel. The only other parties in interest appearing with regard to this compromise are the Creditors' Committee and certain individual members thereof, who are opposed to the compromise. The Funds have refused to provide to the Creditors' Committee full disclosure of materials pertaining to the transactions that are here sought to be compromised and released. (It is more than disingenuous for the Funds

addressed issues raised by a holder of common stock, the Court stating that the Court had an independent duty to do so. The Court approved that portion of the plan, noting, however, that approval is not required where the settlement falls above the lowest level of reasonableness— "The Court should be persuaded that the settlement achieves a just result." Id. at 287. The Court cited *In re Lion Capital Group*, 49 B.R. 163 (Bkrtcy.S.D.N.Y.1985) for that proposition.

In the case of *In re Lee Way Holding Company*, 120 B.R. 881 (Bkrtcy.S.D.Ohio 1990) the compromise before the Court was proposed by a disinterested, duly-appointed trustee. Another distinguishing feature is the fact that the "majority" of the disputes sought to be settled were reflected in pending adversary proceedings. The objectors argued that the trustee had not fully apprised himself of the law and facts necessary to formulate an intelligent and informed opinion with regard to his decision to seek approval of the settlement by which the estate would derive $6 million. The Court noted that the trustee's counsel reviewed approximately 35,000 pages of documents including documents which the defendants had successfully withheld from the objectors under assertions of privilege.

Similarly, in the case of *In re Carla Leather Inc.*, 44 B.R. 457 (Bkrtcy.S.D.N.Y.1984) the proponent of the compromise was a Chapter 7 trustee. Note also that the objector was a principal of the debtor, and the party with whom the trustee wished to compromise was not an insider of the debtor—it was the bankruptcy trustee of the debtor's factor. This decision was affirmed by the District Court at 50 B.R. 764 (S.D.N.Y.1985).

In the case of *In re Texaco, Inc.*, 84 B.R. 893 (Bkrtcy.S.D.N.Y.1988) the compromise at issue was contained in a plan of reorganization—a famous one, the settlement of the judgment against Texaco held by Pennzoil (a judgment in excess of $11 billion) in exchange for a payment of $3 billion. The plan was confirmed.

In the case of *In re International Distribution Centers, Inc.*, 103 B.R. 420 (S.D.N.Y.1989) the District Court affirmed a Bankruptcy Court decision approving settlement that had been proposed by a disinterested, duly-appointed trustee in bankruptcy. The Court stated that "[a] court may give weight to the Trustee's informed judgment that a compromise is fair and equitable," Id. at 423 (citing the *Carla Leather* case).

The case of *In re Aweco, Inc.*, 725 F.2d 293 (5th Cir.1984) seems to be cited by the Funds for the proposition that a Court acts outside its permissible discretion if, having found the relevant legal standard for approval of a compro-

mise to be satisfied, nonetheless disapproves the compromise. This proposition is not evident in that case. The Circuit held therein that the Bankruptcy Court improperly *approved* a compromise because the Court failed to recognize that the "fair and equitable" standard established by the *Anderson* case requires that the compromise respect the priority of senior interests over junior ones.

In the case of *In re Del Grosso*, 106 B.R. 165 (Bkrtcy.N.D.Ill.1989), the proponent of the compromise was the bankruptcy trustee. The estate's cause of action arose out of personal injuries received by the debtor in an automobile collision. There had been complete discovery in State Court. The estate received an offer of $125,000. The objector was the debtor. Although reciting the view that objectors ought not to be permitted to disrupt settlement on the basis of nothing more than unsupported suppositions that would thwart the settlement process, the Court made it clear that the objector in that case was the debtor, and that the paramount interest of creditors, none of whom objected to the proposed compromise, weigh heavily in favor of the settlement.

In the case of *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 390 (Bkrtcy.E.D.Pa. 1987) there was no trustee nor any lengthy litigation. However, the Court considered the approval of the settlement agreement to be "an important and necessary first step for the Debtor in formulating a Plan." Id. at 398. Most importantly the Court discounted the opposition, which, it stated, "arises from partisan concerns of the Secured Noteholders and the Programmers, each of whom has thus far sought to oppose the Debtors at every turn for fear of establishing precedent unfavorable to their interests, generally, in a troubled [broadcasting] industry. In the long run, the Court believes that survival of the Debtors and other members of their industry is in the best interests of all creditors, and, further, that approval of this Settlement Agreement is essential to the survival of the Debtors." Id. at 403.

In the case of *In re A & C Properties*, 784 F.2d 1377 (9th Cir.1986) the proponent of the compromise was a bankruptcy trustee, after a hearing held on appropriate notice, and the lower Court gave deference to the trustee and determined that the compromise should be approved. The Circuit Court affirmed that decision and thought it important to point up that the litigation that was being compromised had been filed in the Bankruptcy Court in 1976, and the Bankruptcy Judge who approved the compromise in 1982 had handled the matter since 1980.

to argue, as they do, that the compromise must be approved because the objectors have not come forward with facts to overcome the prima facie reasonableness of the compromise as set forth in the record before the Court.) Whatever "arms-length bargaining" occurred that led to this compromise occurred among insiders and their counsel (the debtors and the Funds); tripartite negotiations that would have included the Creditors' Committee never occurred in this case until they occurred in the presence of this Court, at the Court's demand, in the midst of these hearings.

The Funds' memo appears to take issue with the view offered by the Court at hearing, that the Court could find $280,000 to be a reasonable dollar amount for the settlement of such claims, and yet exercise its discretion to disapprove the compromise because of the duty, under applicable law, to balance the reasonableness of the compromise against the fact situation of each case (i.e. the concerns the Court has enumerated in the preceding paragraph). The Funds' memo argues that once the Court determines that the compromise is "reasonable" the Court's discretion ends and it would be an abuse of discretion for the Court then to disapprove the compromise.

I am persuaded that I must refine the language of this discussion. I am willing to address the applicable cases in the Funds' language. In that language, I am prepared to conclude that this compromise is *not above the lowest point in the range of reasonableness.* As to the likelihood of success, all we know is based upon what the Funds have chosen to disclose. As to the prospect of complex and protracted litigation, this compromise does not arise in the context of litigation; disapproval of this settlement will not necessarily result in any litigation at all; this is not analogous to an offer of settlement on the eve of extensive discovery or trial. As to the class members who object or support the compromise, it is supported only by insiders and their counsel. (Three affidavits have been obtained by the debtor from creditors who support the compromise; but counsel for the debtor candidly acknowledges that these creditors might not have

been aware that disapproval of the compromise would not assure a delay in distribution of at least some portion of monies available for payment of their claims.) As to the skill and experience and knowledge of the counsel supporting the compromise, it can simply be said that the debtors' counsel and the Funds' counsel support the compromise and the Creditors' Committee counsel opposes. As to the benefits of the compromise, trade creditors would receive approximately 47% rather than 44% of their claims, but they would lose any opportunity to recover anything more than 47%. As to arms-length bargaining, the Committee was not a party to the bargaining that yielded this compromise.

As suggested above, Mr. Hicks and Mr. Kenny are the only witnesses offered by the debtor and the Funds. They are "fact" witnesses as to the compromise process, but have no firsthand knowledge of the transactions sought to be compromised.

They cannot persuade me to approve this compromise over the objection of the only appearing non-insider parties so long as insiders limit the information available to those parties. (Furthermore, the two Committee members who testified, testified that they were misled by PCI into extending further credit on the eve of what turned out to be a decision to liquidate. These two creditors alone extended a half-million dollars or more in new trade credit in the last two months before the announced decision to liquidate. The possibility of pursuing the Funds under 11 U.S.C. § 510 is among the rights that would be extinguished by approval of the compromise.)

Two further comments. The sum total of the Funds' memorandum (including the parts that are beyond the scope of leave granted by the Court) is to the following effect: "Trust us. We know we have done nothing wrong and that the Committee's claims are baseless. We have given up materials that demonstrate how we and the debtors (whom we own and control) reached accord. Ignore the Creditors' Committee's objections because they have come forth with no facts to refute our

showing. For the Court to fail to hear our evidence would be an abuse of discretion, and once the Court hears it it would be an abuse of discretion not to approve the compromise." It is important for the parties to Chapter 11 proceedings involving such disputes to realize that there are a number of ways to address such conflicts. Among them are:

1. Address them in the manner presented here, as a decisive effort to resolve the disputes.

2. Address them in the context of a Creditors' Committee motion seeking leave to commence the action against the insiders. If granted, this would commit only to the expenditure of a certain amount of funds; it would not be conclusive of the rights of either side.

3. Address them in the context of an effort to appoint a disinterested third party to examine the claims with benefit of full discovery and Bankruptcy Rule 2004 powers. This commits only to the incurring of certain expense and inconvenience and does not decide the rights of any party.

4. One can propose the same or a different compromise in a plan of reorganization, with or without provision for a more even "playing field."

Note that of these four options, the most conclusive of all, if approved, is the approval of a compromise. It is nothing but nonsense for the funds to represent to this Court that it would be an abuse of the Court's discretion, under the circumstances of this case, to leave the parties to raise possible resolutions of this controversy in a manner less destructive of rights of non-insiders.

Finally, the Funds suggest that the Committee is simply trying to "shake down" the Funds, demanding money to settle baseless allegations that would be litigated with the Funds money. Unless this Court were to approve the compromise, they argue, they will have to incur substantial inconvenience and expense to prove their

innocence while the estate (76% of which is "their" money) will be eroded in wasteful pursuit of them. Apart from the fact, explained immediately above, that denial of this compromise does not guarantee the result they fear,[4] there is also the fact that if the Court (as opposed to creditors) must choose between precipitously extinguishing any rights of non-insiders, on the one hand, and causing inconvenience and expense to the insiders in such a case, the Court chooses the latter. The transactions at issue here involved tens of millions of dollars. Several millions of dollars of trade debt may never be paid. The Funds may have lost many millions as well. That the Funds may suffer some inconvenience and expense to establish that there has been no unfair dealing as between them and the trade creditors is not unjust.

The compromise is disapproved.

SO ORDERED.

---

**4.** It could well be, for example, that if this same compromise were proposed in a Plan of Reorganization, the Court need not compel full discovery, and yet creditors might vote overwhelmingly to accept the compromise.