In re MATCO ELECTRONICS
GROUP, INC., Debtor.

In re U.S. Assemblies New
England, Inc., Debtor.

In re U.S. Assemblies In Florida,
Inc., Debtor.

In re U.S. Assemblies Raleigh,
Inc., Debtor.

In re Matco Technologies, Debtor.

In re U.S. Assemblies San
Diego, Inc., Debtor.

In re Carolina Assemblies, Inc., Debtor.

In re U.S. Assemblies Hallstead,
Inc., Debtor.

In re U.S. Assemblies In Georgia,
Inc., Debtor.

In re U.S. Assemblies Endicott,
Inc., Debtor.

Nos. 02–60835 to 02–60844.

United States Bankruptcy Court,
N.D. New York.

Nov. 27, 2002.

Berkman, Henoch, Peterson & Peddy, for Official Unsecured Creditors Committee, Garden City, NY, Ronald Terenzi, Of Counsel.

Nixon Peabody, LLP, for Official Unsecured Creditors Committee, Garden City, NY, Douglas Spelfogel, Of Counsel.

Lacy, Katzen, Ryen & Mittleman, LLP, for Debtors, Rochester, NY, David D. Mac Knight, Of Counsel.

Hinman, Howard & Kattell, LLP, for American Manufacturing Services, Inc., Binghamton, NY, Albert J. Millus, Of Counsel.

Menter, Rudin & Trivelpiece, P.C., for BSB Bank & Trust Company, Syracuse, NY, Jeffrey A. Dove, Mitchell J. Katz, Of Counsel.

Robert J. O'Neill, North Andover, MA, for Larry Hargreaves.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

On June 17, 2002, a motion was filed on behalf of Matco Electronics Group, Inc. ("Matco"), U.S. Assemblies New England, Inc., U.S. Assemblies in Florida, Inc., U.S. Assemblies Raleigh, Inc., Matco Technologies, U.S. Assemblies San Diego, Inc., Carolina Assemblies, Inc., U.S. Assemblies Hallstead, Inc., U.S. Assemblies in Georgia, Inc., and U.S. Assemblies Endicott, Inc.(collectively the "Debtors") seeking approval of a compromise between Matco and its subsidiaries, as well as U.S. Assemblies in Georgia, Inc., and American Manufacturing Services, Inc. ("AMS"), dated June 11, 2002 ("Settlement Agreement").[1] *See* Committee's Exhibit X. On June 27, 2002, a limited objection to the Settlement Agreement was filed on behalf of BSB Bank & Trust Company ("BSB"), requesting that certain modifications be made to reflect its security interest in the Debtors' assets; otherwise, BSB supported the proposed settlement.[2] Objection to the mo-

---

**1.** The Settlement Agreement was executed by Lawrence Davis ("Davis") on behalf of the Debtors, and Larry Hargreaves ("Hargreaves") as president of AMS on June 13, 2002. On October 23, 2002, Debtors filed an amended motion, which included a revision of some of the terms of the Settlement Agreement. No amended agreement, actually executed on behalf of any of the parties, has been filed in this case. The primary modifications include the purchase of future inventory needs from the Debtors at the rate of 50 percent of cost, rather than 100 percent of cost and the credit of the purchase price for the Florida operations of $350,000 as indicated below.

**2.** BSB asserts that it is a creditor of the Debtors with a claim of approximately $11,900,000 at the commencement of the cases, secured by the Debtors' accounts receivable and inventory. *See* BSB's Limited Objection, filed June 27, 2002. BSB also contends that as of May 2002 its claim had been reduced to approximately $6,880,000. BSB alleges that it is the holder of a secured claim against T.L. Acquisitions Corporation ("TLA"), which is described as the liquidat-

tion was also filed by the Official Unsecured Creditors Committee ("Committee") on June 27, 2002.

The Settlement Agreement, as revised, provides for the following:

a. AMS would purchase future inventory needs from the Debtors at the rate of 50 percent of cost or an estimated $2.5 million.[3]

b. AMS would release its claims against the Debtors and the Debtors in turn would release their claims against AMS, with certain exceptions as expressed in the Settlement Agreement, and against Hargreaves and Davis. The adversary proceedings brought by the Debtors and the Committee would also be dismissed as to those defendants.[4]

c. AMS is also planning to terminate the Florida operation, leaving as active only the Endicott and Carolina operations. AMS proposes, as part of the Settlement Agreement, to return to the Debtors the personal property it purchased at the auction

in January 2002 with respect to the Florida facility for an immediate credit of the purchase price of $350,000 against AMS's debt to the Debtors.

d. Subject to its obtaining financing, AMS would pay the Debtors for inventory previously purchased in the amount of approximately $5.5 million (less the $350,000 credit).[5] The Settlement Agreement provides that until AMS has made a payment of at least $4,000,000 to the Debtors or to or for the benefit of BSB in reduction of the BSB secured claims, the Debtors have no obligation to provide their release to AMS.

See Affidavit of Hargreaves, sworn to October 21, 2002, at 3–4 and Notice of and Amendment to Motion to Compromise a Controversy with American Manufacturing Services, Inc. ("Amendment to Motion to Compromise"), filed October 23, 2002, at 4, as well as Committee's Exhibit X.

The motion was originally heard on July 2, 2002, at the Court's regular motion term

---

ing agent of the Debtors, in the amount of approximately $9,660,000. *Id.* "Among the collateral pledged to BSB by TLA is TLA's second priority security interest in Matco's accounts receivable and inventory, and its first priority security interest in Matco's equipment." *Id.* BSB asserts a security interest in the proceeds of the settlement as proceeds of its collateral. *Id.*

3. Specifically, ¶ 5 of the Settlement Agreement provides that "AMS will purchase from the Debtors only inventory that meets AMS's specifications or requirements." It does *not* provide that AMS will purchase *all* of the Debtors' inventory. *See* Committee's Exhibit X.

4. Paragraph 4 of the Settlement Agreement provides that while AMS agrees to release the Debtors "of any claim, demand, cause of action or defense that AMS has or may claim to have of any nature whatsoever ... AMS reserves all of its rights, claims, demands, dis-

putes and causes of action that it has or may claim to have against any third party, none of which shall be released, including, but not limited to, claims against creditors of the Debtors due to or on account of any act or omissions in violation of AMS's rights and interests, all of which claims AMS reserves to the fullest extent." *See* Committee's Exhibit X.

5. According to Exhibit "A", attached to the Settlement Agreement, there was due to the Debtors $5,403,512.56 for inventory purchases. AMS had paid $55,315.39 in Blue Cross/Blue Shield payments for Debtors' employees; AMS had paid $293,506.54 for inventory. Debtors had collected accounts receivable belonging to AMS in the amount of $487,067.64 and AMS had collected $250,007.31 in accounts receivable belonging to the Debtors. AMS also owed $675,000 for intangibles and good will. Thus, the total owing to the Debtors by AMS was calculated to be $5,492,630.60.

in Syracuse, New York. The Court indicated that it would hear oral argument on the motion but would not rule on it until after an evidentiary hearing. The parties represented to the Court that they were attempting to reach an agreement on the objections raised by the Committee and requested that the Court adjourn the motion until July 25, 2002. At the request of the parties, the motion was again adjourned to August 6, 2002. *See* Letter of James M. Hayes, Esq., dated July 24, 2002.

At the hearing on August 6, 2002, the parties indicated that they had been unable to reach agreement and following oral argument, the Court indicated that it would schedule an evidentiary hearing. The evidentiary hearing was held commencing on November 1, 2002, and continuing on November 6 and November 7, 2002, at which time the Court indicated it would issue a written decision without further submission of any memoranda of law.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (b)(2)(A) and (O).

## FACTS

On February 13, 2002, Debtors' creditors filed involuntary petitions pursuant to chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101–1330 ("Code"). On March 8, 2002, the Court signed an Order granting the motion of the petitioning creditors for joint administration of the cases. On March 15, 2002, the Court granted the Order for Relief, effective March 11, 2002. The Committee was appointed by the U.S. Trustee on or about March 27, 2002. On April 22, 2002, the Committee commenced an adversary proceeding against the Debtors, BSB, AMS, T.L. Acquisitions Corporation ("TLA"), James Matthews ("Matthews"),[6] Hargreaves and Davis.[7,8] On May 3, 2002, it sought authorization to prosecute the adversary proceeding. The Court heard oral argument on the Committee's motion, as well as cross-motions filed on behalf of the Debtors and AMS pursuant to Rule 12(b) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), as incorporated in Rule 7012(b) of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P."), seeking dismissal of the Committee's complaint. On July 10, 2002, the Court issued its Memorandum–Decision, Findings of Fact, Conclusions of Law and Order, authorizing the Committee to prosecute the adversary proceeding commenced by it on behalf of the Debtors as to nine of its eleven causes of action. The Court denied the cross-

---

**6.** Matthews has been identified as the president and sole shareholder of Matco. He is also the president and sole shareholder of U.S. Assemblies in Georgia, Inc. Matco, in turn, is the sole shareholder of the remaining Debtors, for which Matthews also serves as president.

**7.** The causes of action originally asserted in the Committee's complaint are: 1) fraudulent transfers pursuant to Code § 548(a)(1)(A); 2) fraudulent transfers pursuant to New York Debtor and Creditor Law; 3) constructively fraudulent transfers pursuant to Code § 548(a)(1)(B); 4) piercing the corporate veil; 5) appropriation of corporate opportunity; 6)

breach of fiduciary duty; 7) violation of the Uniform Commercial Code; 8) equitable subordination; 9) marshaling of assets; 10) preferences and 11) turnover and accounting.

**8.** On May 28, 2002, the Debtors commenced an adversary proceeding by the filing of a complaint naming BSB, TLA and Matthews as defendants. AMS, Hargreaves and Davis are not party defendants in that action. The Debtors' causes of action are similar to those of the Committee with respect to causes of action numbers one, two, three and nine of the Committee's complaint.

motions of the Debtors and AMS to dismiss the Committee's complaint, with the exception of the fourth and fifth causes of action.

At the evidentiary hearing, Hargreaves testified on behalf of AMS that he has a Canadian accounting degree identified as an "RAA" and is a member of the Turnaround Management Association. He has been working in the electronics contract manufacturing business for the past 17–18 years in the area of finance. It was his testimony that he was hired by the Debtors as a turnaround specialist and served as interim Chief Financial Officer of Matco for approximately 10–11 months. On or about November 30, 2001, Matco's largest secured creditor at that time, the National Bank of Canada ("NBOC"), refused to advance further funds to Matco and began collecting its receivables. According to Hargreaves, in the interim the decision had been made to liquidate Matco. To that end, AMS was formed in October 2001 and Hargreaves then became its president and Chief Executive Officer. He testified that he is not a shareholder of AMS.

In January 2002, AMS purchased the equipment located at a number of the Debtors' facilities pursuant to UCC Article 9 sales.[9] Hargreaves testified that AMS also had purchased approximately $5,687,000 in inventory from Matco and had paid approximately $300,000 for it. Hargreaves acknowledged that AMS pays the salaries and benefits of what are still Matco's employees. He testified that AMS also pays the payroll expenses of TLA. Hargreaves explained that if AMS did not pay TLA's payroll, TLA would be unable to liquidate Matco's inventory and AMS would have to close its operations without inventory.

Davis testified as the Court-designated responsible party for the Debtors.[10] In this capacity, he testified that he was responsible for safeguarding the assets of the Debtors and assisting with the orderly liquidation of those assets, while keeping the Court appraised of the results of his efforts. It was his testimony that he had worked for a number of Matthews' entities in various financial capacities over a 23 year period, including that of controller and secretary/treasurer.[11] He also serves on the Boards of Directors of most of Matthews' companies, of which he testified there are approximately ten. He testified that from 1988, when Matco was acquired by Matthews, he worked closely with management in developing growth plans and financial planning, including negotiating with various financing institutions and overseeing the budget. He explained that the Debtors had gone through a liquidation process for the two years prior to December 2001, having lost several major customers who allegedly breached their contracts with the Debtors and having been unsuccessful in obtaining additional financing from their lenders.

According to Davis, TLA was formed at the request of BSB to conduct the liquidation of the Debtors' assets. He currently serves as president of TLA, actually overseeing the liquidation of Matco's in-

9. *See* Testimony of Lawrence Davis, *infra,* for further discussion of UCC Article 9 sales.

10. On July 10, 2002, the Court signed an Order designating Davis, as well as Matthews, as "the Responsible Persons" of the Debtors. Davis acknowledged being a stockholder in AMS at the time he executed the Settlement Agreement on behalf of the Debtors, having made a capital contribution of $500,000 to the company.

11. According to Davis, he stepped down as secretary-treasurer of Matco in March 2001, but continued to assist Hargreaves, who at the time had taken over the duties of treasurer.

ventory and collecting accounts receivable. He was also involved in what he describes as the "Article 9 secured party sales of equipment" in January 2002. AMS purchased equipment located at the Florida facility, the Raleigh facility, the South Carolina facility, the Endicott facility and the Matco facility.[12] According to Davis, AMS had made full payment of $2.425 million for the equipment at those facilities. *See* AMS's Exhibit 8.

When asked on cross-examination how TLA was empowered to liquidate the Debtors' assets, Davis testified simply that TLA borrowed $12 million from BSB and is repaying those monies through the liquidation of Debtors' assets.[13] He testified that to date AMS owes the Debtors $5.2 million for the inventory it previously purchased.

According to Davis, at the time AMS was formed, it was anticipated that AMS would be able to obtain financing on the equipment it had purchased at the Article 9 sales of the Debtors' assets and ultimately would be able to obtain advances on accounts receivable. However, AMS's ability to obtain the financing was adversely impacted as a result of the involuntary petitions filed against the Debtors and the Committee's commencement of the adversary proceeding in the cases, naming AMS, *inter alia,* as a defendant. Davis acknowledged that AMS's ultimate ability to pay for the inventory is dependent on its being able to obtain future financing.

With respect to the terms of the Settlement Agreement, Davis testified that he had agreed, on behalf of the Debtors, to the payment of $4 million immediately upon AMS obtaining financing.[14] When asked about the fact that the Settlement Agreement provided for releases to AMS, Davis and Hargreaves upon the initial payment of the $4 million, despite the fact that there would have been an additional $1.2 million still to be paid by AMS under the terms of the Settlement Agreement, Davis testified that it was his belief that if AMS was able to obtain financing and paid the $4 million to the Debtors, there was a reasonable likelihood that it would also be able to pay the balance.[15]

12. AMS was also to purchase the equipment at the Hallstead facility for $1.5 million, but a temporary restraining order was obtained by G.E. Capital Corporation, which asserted an interest in certain assets, preventing the sale from going forward at that time.

13. There have been allegations made that TLA actually purchased BSB's secured position for $12 million for which TLA did not pay cash. Instead, BSB took a demand note for the purchase price and acquired a security interest in TLA's assets. According to BSB, collateral pledged to it includes TLA's second priority security interest in Matco's equipment on an obligation to BSB in excess of $9,667,000. *See* BSB's Limited Objection, filed June 27, 2002.

14. The language of the Settlement Agreement actually does not provide for any specific date or time frame for the payment of the initial $4 million. It does state that the agreement "shall become effect [sic] upon the approval of the bankruptcy court in which the Debtors' cases are pending." It also states that an additional $500,000 would be paid 30 days after the "Effective Date," which is defined no where in the agreement. The remaining unpaid balance is to be paid within 180 days of the "Effective Date." According to the Amendment to Motion to Compromise, signed by Debtors' counsel, "AMS diligently shall seek financing to pay all the settlement proceeds in one installment within a reasonable time . . . ."

15. The Court inquired of Debtors' counsel, David MacKnight, Esq., whether he had negotiated the Settlement Agreement with AMS. He indicated that Davis and Hargreaves had negotiated it. He admitted that he had not attempted to negotiate a finite end to the time for payment of the initial $4 million, explaining that in his experience there were always issues that arose with respect to financing which made it uncertain that it would be

Davis testified that if the Settlement Agreement was not approved and AMS was forced to liquidate, it would not be able to pay the Debtors in full for the inventory it had already received and would also not be able to purchase any additional inventory. If, however, the Settlement Agreement was to be approved, he testified that AMS "may" be able to pay for the inventory and that the prospects of being able to do so were certainly much better in the event the Settlement Agreement was approved.

The Court also heard testimony from Scott Gustafson, who had been employed formerly as general manager of Matco and is now employed by TLA to liquidate the Debtors' inventory. It was his view that there would be a benefit to the Debtors to have AMS purchase the remaining inventory at 50% of the Debtors' cost; otherwise, it was his belief that the Debtor would simply be "sitting on it." Gustafson explained that generally in the electronics industry no one wishes to purchase parts that are more than two years old. He explained further that there were always engineering changes occurring, as well as damage to the parts from dust, handling and corrosion, despite the best efforts to protect them. He explained that AMS does not have the date restrictions and packaging restrictions that potential purchasers in the open market might have with respect to the remaining inventory and that in many instances the inventory remaining was product specific to customers of AMS that had formerly been customers of Matco. He estimated that there was approximately $1.5 million that could be recovered if the Settlement Agreement was approved and AMS were to purchase the inventory it needed from the Debtors.

Davis testified that he believed the figure to be higher.

The Committee presented the testimony of William Giovanniello of BDO Seidman, LLP, a certified public accountant and turnaround specialist. He visited the facilities of Matco, TLA and AMS and reviewed the records of AMS, including balance sheets, accounts receivable, accounts payable and bank statements and also met with Heidi Wagner, AMS's controller. Based on the book value of assets and liabilities as of July 31, 2002, he calculated the high and low end of the range of AMS's assets less liabilities of $3,728,000 and $335,000, respectively. *See* Committee's Exhibit U. In arriving at these figures, he assumed an orderly liquidation with contracted work completed and AMS being able to collect on its receivables. Upon cross-examination, he acknowledged that he had not studied national trends of accounts receivable in the electronics contract manufacturing business in terms of collectability. Nor had he inspected any of the equipment or performed an appraisal of it. He also acknowledged that the value of AMS's customer list did not take into consideration the nature of the specific customers on the list.

AMS presented the testimony of Roger Scalia, who is in the business of refurbishing equipment for the electronics industry for printed circuitry board manufacturing and testing. He had inspected the equipment of U.S. Assemblies Hallstead, Inc. and U.S. Assemblies Endicott, Inc. He also reviewed pictures of equipment at U.S. Assemblies in Florida, Inc. and spoke with the general manager. His list of equipment also included that located at Carolina Assemblies, Inc.'s facility, for which he apparently had no pictures and had not

forthcoming in a short period of time. He also acknowledged that any payments that were forthcoming would be paid to BSB,

which has a security interest in the Debtors' equipment, inventory and accounts.

visited its operations. He did speak with the general manager at that facility, as well. He did not appraise the equipment at U.S. Assemblies Raleigh, Inc. He testified that his valuation of the equipment was based on what the market for such equipment was at the time (May 2002), as well as its condition. With respect to the Carolina and Florida equipment, he assumed that the equipment was in average condition. It was also his testimony that pricing had gone down since he had performed the appraisal. The equipment that he appraised at the four facilities had been purchased from the Debtors for a total price of $2,750,000.[16] *See* AMS Exhibit 8. He estimated a high liquidation value for the equipment of $1,353,764 and a low liquidation value of $896,164, exclusive of the equipment of the Raleigh facility.[17]

## ARGUMENTS

It is the Debtors' position that the settlement will lead to payment by AMS to the Estate of approximately $5.2 million and continued sale of inventory to AMS by Matco. Debtors assert that the Committee is going to have a difficult time recovering from AMS in the adversary proceeding, even if it is able to obtain a judgment against AMS, unless AMS is able to obtain financing. According to AMS, it is unable to refinance with the adversary proceeding pending and without financing it will be forced to go out of business.

It is the Committee's position that there is actually nothing being settled. AMS is simply agreeing to pay what it admittedly owes for inventory it purchased from Matco. In exchange, AMS is to receive a release that is binding on the Committee and would prevent it from seeking to re-

cover from AMS, as well as Hargreaves and Davis, in the context of its pending adversary proceeding.

AMS points out that even if the Committee is successful in the adversary proceeding and AMS is compelled to return inventory and equipment purchased from the Debtors, the Debtors will not be in a position to do anything with what is described as obsolete inventory and equipment, because the Debtors are no longer operating.

## DISCUSSION

■ Fed.R.Bankr.P. 9019(a) authorizes the Court to approve a compromise or settlement. It is a matter of the Court's discretion and requires that the Court determine whether the settlement is fair and equitable and in the best interest of the estate. *See Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). To this end, the Court must

> "weigh all factors bearing on the reasonableness of the settlement, including: 1) the probability of success of the litigation; 2) the difficulties, if any, to be encountered in the matter of collection; 3) the complexity of the litigation involved, and the expense and inconvenience in delay necessarily attending it; and 4) the paramount interest of the creditors and a proper deference to their reasonable view."

*In re Del Grosso,* 106 B.R. 165, 168 (Bankr.N.D.Ill.1989) (citations omitted); *In re Jasmine, Ltd.,* 258 B.R. 119, 123 (D.N.J.2000).

AMS has asserted that it is the Committee's burden "to satisfy the Court that the proposed Compromise Settlement is not in

---

**16.** According to AMS Exhibit 8, AMS had also purchased equipment located at the Matco facility for $425,000, for which there was no liquidation values.

**17.** There was testimony to the effect that the Raleigh facility had never opened and the equipment had never been used when it was sold to AMS for $750,000.

the best interest of the Debtors' estates. To carry this burden, the Creditors' Committee must establish now that it will be successful in setting aside the sales to AMS, that it will obtain a judgment against AMS for more than AMS has agreed to pay and that it will be successful in recovering the judgment amount from AMS." *See* Affidavit of Hargreaves, sworn to June 26, 2002, at 20.

■ Contrary to AMS's position, case law makes it clear that the burden of persuading the Court that the settlement should be approved rests with the proponents of the settlement. *See Del Grosso,* 106 B.R. at 168. The parties proposing the settlement must show that it is reasonable and that

1) the settlement was not collusive; 2) that the proponents have counsel experienced in similar cases, 3) that there has been sufficient discovery of the underlying claims of parties to enable counsel to act intelligently; and 4) that the number of objectants or their relative interests is small.

*Id.; see also In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 493, 497 (Bankr. S.D.N.Y.1991) (examining several factors in determining whether the compromise is above the lowest point in the range of reasonableness, including, *inter alia,* the nature and breadth of releases to be obtained by officers and directors).

Before addressing itself to the specific terms of the Settlement Agreement and the arguments made by the parties, the Court feels compelled to comment on certain concerns which for the Court represent "red flags" in this matter. First of all, the Settlement Agreement is not being proposed by a disinterested trustee in the cases. Davis, who signed the Settlement Agreement on behalf of the Debtors, is a shareholder of AMS, with a vested interest in the outcome, as well as president of TLA, the very company that is in the process of liquidating the Debtors' assets. Secondly, the Settlement Agreement provides for the release of the very individuals who signed it, namely, Hargreaves and Davis, without any apparent explanation for their release or consideration being tendered on their part. Thirdly, the Settlement Agreement provides for the release of the claims asserted against AMS, Hargreaves and Davis. The three are not identified as party defendants in the adversary proceeding commenced by the Debtors; however, they are named in the adversary proceeding commenced by the Committee. Yet, the Committee, though bound by its terms, is not a party to the Settlement Agreement that proposes to release these three from its claims in the adversary proceeding. The Settlement Agreement specifically provides that there is to be no release by AMS of any claims it might have against the creditors. In addition, the current motion seeking approval of the Settlement Agreement appears to the Court to represent an "end run" around its denial of motions by both the Debtors and AMS to dismiss the causes of action against, *inter alia,* AMS, Hargreaves and Davis.[18]

■ It is with these factors in mind that the Court is asked to make a finding that the Settlement Agreement is fair and equitable and in the best interest of the estate. Much of the argument that the Court has heard from the proponents of the Settlement Agreement has emphasized the interests not of the estate and of the Debt-

---

18. The Court recognizes that at the time the motion was filed by the Debtors on June 17, 2002, there had been no ruling on the cross-motions of the Debtors and AMS seeking dismissal of the Committee's complaint. However, final argument on the motion herein took place on August 6, 2002, approximately one month after the issuance of its July 10, 2002 Decision.

ors but of AMS and to some extent of the secured creditor, BSB. Yet, a major consideration for the Court is the interests of the unsecured creditors, who in this case have through the Committee expressed serious objections to the Settlement Agreement.

■ The Court finds instructive a case decided by the U.S. Bankruptcy Court in the Western District of New York approximately ten years ago. *See In re The Present Co., Inc.*, 141 B.R. 18 (Bankr. W.D.N.Y.1992). In that case, involuntary petitions were filed against The Present Co., Inc. ("PCI") and its subsidiary, Daniels Tobacco Co., Inc., on December 27, 1991. PCI was a subsidiary of PCI Holdings, Inc., which was owned by four limited partnerships (the "Funds"), which in turn held 90% of PCI Holdings stock. In early 1991 a Mr. Hicks was recruited as a turnaround specialist and was appointed CEO of the debtors. Following the "demise" of the debtors, he became an officer of an affiliate of the Funds while continuing as the executive officer "of what remains of the debtors." *Id.* at 19. A decision had been made by the Boards of Directors of both debtors to liquidate on October 25, 1991. The order for relief was entered on February 11, 1992, at which time the liquidation of the debtors had nearly been completed. Of the $63.2 million in unsecured claims, approximately $48 million, or 75% of all of the unsecured claims, was owed to the Funds and approximately $11.4 million, or 18% of all of the unsecured claims, was owed to trade creditors.

The creditors' committee in that case raised allegations of fraudulent transfers and the possibility of equitably subordinating the claims of the Funds.[19] The Funds offered $280,000 to be distributed only to the trade creditors in exchange for the release of any possible claims against the Funds, viewed by the court as insiders of the debtors, and the foreclosure of any objections to the Funds' claims. The creditors' committee opposed the debtors' motion brought pursuant to Fed.R.Bankr.P. 9019(a). It asserted that it was without sufficient information to analyze the merits of the potential claims given that the Funds had refused to comply with the committee's discovery demands concerning the underlying transactions which would be the subject of the fraudulent and equitable subordination claims.

Hicks, as well as the debtors' attorney, testified on behalf of the debtors that they believed the committee's claims were without merit. Both witnesses were found to be "skilled professionals of high integrity, who made investigation into the possible claims against the Fund, and who reached a determination that the $280,000 settlement should be approved." *Id.* at 21. Bankruptcy Judge Michael J. Kaplan noted that "[t]he Funds' view is that if I find that their offer is fair and reasonable, then I must protect them and the estate from needless invasion [by way of litigation costs] and approve the compromise." *Id.* The Funds argued that if such a finding was made by the bankruptcy court, it would be an abuse of discretion to then deny approval of the compromise. *Id.* at 21, 24. In support of their position, the Funds presented the court with numerous cases, which the court found distinguishable from the matter before it, noting that in each of those cases either

> the proponent of the compromise was a disinterested, duly appointed bankruptcy trustee; or the compromise was of matters that were in litigation, and were the subject of full and complete discovery; or the compromise was proposed in

19. During the non-bankruptcy liquidation, the then *unofficial* creditors' committee had raised these same allegations.

a plan of reorganization upon which creditors voted; or the "arms-length" nature of the compromise was beyond dispute.

*Id.* at 22. The court pointed out that there was not a disinterested trustee or examiner and that the only parties supporting the proposed compromise were insiders, namely the debtors and the Funds. *Id.* at 23. The court observed that "tripartite negotiations that would have included the Creditors' Committee never occurred in this case until they occurred in the presence of this Court, at the Court's demand, in the midst of these hearings." *Id.* at 24.

The court proceeded to examine the factors enumerated above, including the likelihood of success, the prospect of complex and protracted litigation, etc. It also considered whether the compromise was the result of arms-length bargaining and made a finding that the committee was not a party to the bargaining that yielded this compromise, thus raising the inference that the settlement was not the result of arms-length bargaining as it involved only insiders. The court concluded that "[t]hey cannot persuade me to approve this compromise over the objection of the only appearing non-insider parties so long as insiders limit the information available to those parties." *Id.*

Fed.R.Bankr.P.9019(a) indicates that the Court **may** approve a compromise or settlement *proposed* by, in this case, the Debtors–in–Possession. As noted by the Court in *Del Grosso,* in order to approve a settlement, the Court must find that it is reasonable **and**, *inter alia,* that it is not collusive and the number of objectants or their relative interests are small. The Court perceives many parallels between the proposed compromise in *Present Co.* and the matter now before it and has many of the same concerns as Judge Kaplan. The "red flags" noted above weigh against the approval of the Settlement Agreement. There are serious questions raised as to whether it represents an arms-length transaction, given Davis's pecuniary interest in AMS and the fact that under the terms of the Settlement Agreement both Davis and Hargreaves, who executed the Settlement Agreement, are to be released from any claims of the Committee. Debtors' counsel indicates that he took little, if any, part in the negotiations of the Settlement Agreement.[20] Perhaps most telling is the fact that the Committee had no part in negotiating the Settlement Agreement, yet it is the claims it has asserted on behalf of the Debtors in its adversary proceeding against AMS, Davis and Hargreaves, that are being released. At the same time, under the terms of the Settlement Agreement, any claims AMS might have against the creditors remain viable. In addition, the Settlement Agreement attempts to settle only a portion of the adversary proceeding so that it certainly is not going to eliminate the prospect of complex and protracted litigation.

Much of the focus of the proof presented by AMS and the Debtors has been on the difficulties to be encountered in collecting on any judgment from AMS should the Committee be successful in the adversary proceeding. That is but one factor the Court must consider. Another factor it must consider is "the paramount interest of the creditors and a proper deference to their reasonable view." AMS has presented evidence to support its contention that unless it is released from the adversary proceeding as a defendant, it will be unable to obtain financing and will have to close its doors. If that should occur, it appears that the one that will be impacted

---

**20.** The Court also notes that most of the proof at the evidentiary hearing was proffered by counsel for AMS, not the Debtors.

is BSB, which is alleged to have a security interest in the Debtors' accounts receivable and has asserted an interest in any proceeds of the settlement. *See* Limited Objection of BSB, filed June 27, 2002. Obviously, the Committee feels that its only chance for any recovery is not by means of the Settlement Agreement but by means of the adversary proceeding and the hope that it will be successful in equitably subordinating the claims of BSB and of Matthews.

For the reasons discussed above, the Court concludes that the proponents of the Settlement Agreement have failed to meet their burden of establishing that it is fair and equitable and in the best interest of the estate.

Based on the foregoing, it his hereby

ORDERED that Debtors' motion seeking approval of the Settlement Agreement pursuant to Fed.R.Bankr.P. 9019(a) is denied.